T. Jason Wood, ISB No. 5016
WOOD LAW GROUP, PC
Jefferson Place, 5th Floor
350 North 9th Street, Suite 500
Boise, ID  83702
Tel: (208) 497-0400
Fax: (208) 932-4380
Email: jason@woodlaw.net

Shamim J. Ahmed, NYSB No. 4857298
FIRST LOOK LAW, PLLC
133 Swamp Rd
East Hampton, NY 11937-2559
(Suffolk County)
Tel: (917) 428-2785
Email: shamim@firstlook.law

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **TTAN, LLC**, a Utah limited liability company; and **BRADLEY J. BOYLE**, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>**KYLE J. COPELAND**, *et al.,*<br><br>Defendants. | Case No. 1:25-cv-00526-AKB<br><br>**PLAINTIFF'S REPLY IN SUPPORT MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (RULE 65), FOR ALTERNATIVE SERVICE (RULE 4(f)(3)), AND FOR OTHER RELIEF (Dkt. 40)** |

## INTRODUCTION

Defendants attempt to portray this case as a routine employment dispute involving a "disgruntled" former CEO. They ask this Court to stand down based on the "Business Judgment Rule" and an arbitration clause. This narrative is destroyed by the Defendants' own documents, which reveal not a business dispute, but a documented corporate theft in progress.

If this were a legitimate business disagreement, the Defendants would not have needed to create a "Management Board" that excluded only the Plaintiff to hide their actions. (*See* Plaintiffs'

---

Supplemental Decl.  ¶ 14, Exhibit 28). If this were a legitimate asset sale, the Seller (JIFU) would not have paid the Buyer (Unity Global) $5,000,000.00 to take the assets. (See APA, Complaint Exhibit 20, § 2(b)).

The "Business Judgment Rule" protects directors who make difficult decisions; it does not protect fiduciaries who sell the Company's assets to an entity they control for "negative consideration." The "Asset Purchase Agreement" attached to the Complaint admits that Defendants engaged in a Fraudulent Transfer by moving $5 million in liquid cash and the Company's entire intellectual property portfolio to a Dubai entity managed by Defendant Kyle Copeland. (See Supplemental Decl. Exhibit 40).

Furthermore, Defendants have engineered an imminent, irreparable "Tax Squeeze" against the Plaintiffs. By retaining between $7.9 million (per the "Richey May Report") and $12.9 million in cash while refusing to make the mandatory tax distributions required by Section 3.6 of the Operating Agreement, Defendants are forcing Mr. Boyle to incur massive personal tax liability on "phantom income" without the cash to pay it. This is a textbook oppression tactic designed to bankrupt a minority member.

Finally, a massive discrepancy between the Defendants' own exhibits-the $7.9 million listed in the Richey May Report (Doc. 47-7) versus the $5 million outflow listed in the APA-creates a "forensic black hole." It is impossible to know if the Company holds $7.9 million or $12.9 million, or if the funds have already been wired to the UAE. Defendants' refusal to provide books and records, justified by the demonstrably false claim of "security concerns" (See Copeland Decl. 9 vs. Supplemental Boyle Decl. ¶17), confirms that they are hiding the flow of funds.

---

The question before the Court is not whether the merits of this dispute belong in arbitration. The question is whether there will be any assets left to arbitrate. Unless this Court issues a Temporary Restraining Order to freeze the status quo, the Defendants will complete the looting of JIFU, LLC, rendering the arbitration a hollow formality and leaving Plaintiffs with a worthless interest in an empty shell.

## I.    DEFENDANTS' TERMINATION OF MR. BOYLE WAS NOT AN EMPLOYMENT DECISION; IT WAS THE FIRST STEP OF A CALCULATED SQUEEZE-OUT.

The defendants' briefing and their supporting declarations focus extensively on why they believe Mr. Boyle was a "bad boss." This is legally irrelevant. Mr. Boyle does not claim any damage or injury arising from his employment as CEO of the Company. (See Dkt. 1). Rather, his claims arise from his status as member and 18% owner of the Company, which is worth more than $30 million by the defendants' own agreed value. Even if Mr. Boyle were the worst CEO in history (which he was not), that does not give the defendants the right to unilaterally misappropriate his multi-million dollar ownership interest in the Company.

The defendants' remedy for Mr. Boyle's allegedly poor work performance was to remove him as the CEO, which they in fact did. 2 If they want an offset or damages arising from Mr. Boyle's conduct as CEO of the Company, they are free to answer the complaint and allege a counterclaim accordingly. They have chosen not to do so. Unless and until they do, Mr. Boyle's work performance as the Company CEO is entirely irrelevant to any of the claims alleged in the Complaint or issues raised in Plaintiffs' motion for TRO. Any and all such factual averments in their declarations should be stricken and otherwise disregarded.

If the Court is inclined to consider the defendants' irrelevant and prejudicial factual assertions, and in any case to set factual record straight, it is imperative to not that the defendants'

declarations are demonstrably impeached by their own contemporaneous communications. Plaintiffs direct the Court's attention to Mr. Boyle's supplemental declaration filed herewith, in which he systematically refutes the defendants' factual assertions with documentary proof.

Defendants devote the entirety of their "Factual Background" (Defendants' Resp. 1-11) and the bulk of the Declaration of Paul Southam to attacking Mr. Boyle's performance as CEO. This entire line of argument is a legal nullity. Defendants are attempting to defend against the tort of Minority Oppression by citing irrelevant employment grievances.    They seem genuinely shocked there are legal limits on their ability to oppress a minority member.  Well established law in that regard acts as a "bill of rights" for minority owners in closely held business entities.

A.    _Steelman_ **Defines Termination as Oppression, Not Business Judgment**

"Squeeze-outs, sometimes called freeze-outs, are actions taken by the controlling shareholders to deprive a minority shareholder of his interest in the business or a fair return on his investment." *McCann v. McCann*, 152 Idaho 809, 815, 275 P.3d 824, 830 (2012) (citing *Balvik v. Sylvester*, 411 N.W.2d 383, 386 (N.D.1987). "Because of the predicament in which minority shareholders in a close corporation are placed by a squeeze-out situation, courts have analyzed alleged 'oppressive' conduct by those in control in terms of 'fiduciary duties' owed by the majority shareholders to the minority and the 'reasonable expectations' held by the minority shareholders in committing their capital and labor to the particular enterprise." *Id.* (quoting *Balvik*, 411 N.W.2d

Idaho case law is clear on the fiduciary duty owed by directors.  "As fiduciaries, corporate directors are bound to exercise the utmost good faith in managing the corporation. However, the 'business judgment rule' immunizes the good faith acts of directors when the directors are acting

within the powers of the corporation and within the exercise of their honest business judgment." *Steelman v. Mallory*, 110 Idaho 510, 513, 716 P.2d 1282, 1285 (1986) (internal citations omitted). "In Idaho a director has a fiduciary responsibility to both the corporation and to shareholders." *Weatherby v. Weatherby Lumber Co.,* 94 Idaho 504, 506, 492 P.2d 43, 45 (1972). More specifically, "[t]hat the directors of a closely held corporation owe a fiduciary duty to the minority shareholders is well recognized.'" *Jenkins v. Jenkins*, 138 Idaho 424, 428, 64 P.3d 953, 957 (2003) (quoting *Steelman*, 110 Idaho at 513, 716 P.2d at 1285).

In *Steelman*, a shareholder of a closely-held corporation filed suit against the two controlling shareholders, alleging a breach of fiduciary duty. An individual action was allowed where the directors breached their fiduciary duty by usurping an opportunity that existed and would have been performed by the corporation but for a disagreement amongst the directors. *Steelman*, 110 Idaho at 513–14, 716 P.2d at 1285–86. *Steelman* held that in a closely-held corporation, the corporate directors owe a fiduciary duty to one another, to the corporation and to the shareholders, including the minority shareholders. *Id.* at 513, 716 P.2d at 1285. "Since Mallory and Jensen, as directors in this small closely held corporation, had a fiduciary duty to Steelman, as a minority shareholder, we cannot agree with appellants' contention that this case should have been dismissed because it is a 'direct action' rather than a shareholder's derivative suit." *Id*.

"The holding in *Steelman* is consistent with holdings from other states and legal authorities. A well-recognized exception to the rule that a shareholder must bring a derivative action for claims alleging injury to the corporation is that in a closely held corporation a minority shareholder may bring a direct action, rather than a derivative action, if the shareholder alleges harm to himself distinct from that suffered by other shareholders of the corporation or breach of a special duty owed

by the defendant to the shareholder." *McCann,* 152 Idaho at 815–16, 275 P.3d at 830–31 (citing *Cunningham v. Kartridg Pak Co.*, 332 N.W.2d 881 (Iowa 1983) (citing *Thomas v. Dickson*, 250 Ga. 772, 301 S.E.2d 49 (1983); *Russell v. First York Savings Co.*, 218 Neb. 112, 352 N.W.2d 871 (1984), *overruled on other grounds in Van Pelt v. Greathouse*, 219 Neb. 478, 364 N.W.2d 14 (1985); *Crosby v. Beam*, 47 Ohio St.3d 105, 548 N.E.2d 217 (1989); *Horizon House–Microwave, Inc. v. Bazzy*, 21 Mass.App.Ct. 190, 486 N.E.2d 70 (1985); *Schumacher v. Schumacher*, 469 N.W.2d 793, 798 (N.D.1991); *Action in Own Name by Shareholder of Closely Held Corporation*, 10 A.L.R. 6th 293 § 13 (2006)).

"As fiduciaries, corporate directors are bound to exercise the utmost good faith in managing the corporation." *Steelman*, 110 Idaho at 513, 716 P.2d at 1285 (citing *Great Western Producers,* 41 Colo.App. 349, 588 P.2d 380, 382 (1978), *aff'd,* 200 Colo. 180, 613 P.2d 873 (1980); *Poweroil Mfg. Co. v. Carstensen*, 69 Wash.2d 673, 419 P.2d 793, 796 (1966)).

"**Typically, relief has been granted in non-fraud oppression cases where the majority has engaged in squeeze-out conduct**." *McCann*, 152 Idaho at 816, 275 P.3d at 831 (citing *Balvik*, 411 N.W.2d at 387; *Landstrom v. Shaver*, 561 N.W.2d 1, 10 (S.D.1997)). The Idaho Supreme Court has recognized taht "[t]he majority shareholders can apply numerous means to accomplish the squeeze-out.  Holders of a majority of the voting shares in a corporation, through their ability to elect and control a majority of the directors and to determine the outcome of shareholders' votes on other matters, have tremendous power to use a great variety of devices or modes of operation to benefit themselves at the expense of minority shareholders." *McCann*, 152 Idaho at 816, 275 P.3d at 831 (citation omitted).

The Supreme Court has provided "a few illustrations[:] The squeezers may cut off the flow

of income to the minority by refusing to declare dividends or they may deprive minority shareholders of corporate offices and of employment by the company. At the same time, the squeezers can protect their own income stream from the business by exorbitant salaries and bonuses to the majority shareholder-officers and perhaps to their relatives, by high rental payments for property the corporation leases from majority shareholders, or by unreasonable payments under contracts between the corporation and majority shareholders." *McCann*, 152 Idaho at 816, 275 P.3d at 831 (quoting F. Hodge O'Neal & Robert B. Thompson, Oppression of Minority Shareholders and LLC Members § 3.2 (Rev. 2nd ed. 2004) (attached in Appendix); *see also* Note, Freezing Out Minority Shareholders, 74 Harv.L.Rev. 1630 (1961)). **Or by firing the minority shareholder from his position as CEO.** *See, e.g., Bonavita v. Corbo,* 300 N.J. Super. 179, 196, 692 A.2d 119, 128 (Ch. Div. 1996) ("When defendants terminated the salary payments made to [Director] Gerald Bonavita, they had an obligation to provide, or at least try to provide, some alternative benefit to the holder of the Bonavita stock. They were not free simply to ignore those interests and operate the corporation for the sole benefit of Alan Corbo.").

Thus, when Defendants argue they "had to fire Mr. Boyle" for cause (Southam Decl. 35), they are not establishing a legal defense; they concede the most important element of a *McCann* squeeze-out. When combined with the other oppressive conduct outlined in Plaintiffs' initial brief and declaration, the likelihood of Plaintiff's success on their claim of minority oppression is clear.

**B.**    **The Arbitration Clause Does Not Foreclose The Preliminary Relief Plaintiffs Request**.

The defendants seek refuge from Plaintiffs' requested preliminary relief behind the arbitration clause of the sham Asset Purchase Agreement (APA), asking the Court to "deny the

[Plaintiffs'] Motion for improper venue." (Dkt. 47 at 4). Plaintiffs have never filed such a motion nor sought such relief. Rather, it is the defendants have moved to *compel* arbitration, while simultaneously asking the Court to dismiss Plaintiffs' the entire Complaint on the merits, with prejudice. (Dkt. 20-1).

The Ninth Circuit has held that "seeking a decision on the merits of a key issue in a case," including a motion to dismiss under Rule 12(b)(6), "indicates an intentional and strategic decision to take advantage of the judicial forum" which can result in a waiver of the right to compel arbitration of the issue. *Banq, Inc. v. Purcell*, No. 23-15229, 2024 WL 4164126, at *1 (9th Cir. Sept. 12, 2024) (citation omitted). The defendants requested dismissal of this case "in its entirety" on the merits in their Rule 12(b)(6) motion to dismiss. (Dkt. 20-1 at 14–19). They requested this relief *conjunctively*, not alternatively, thereby "play[ing] heads I win, tails you lose," which constitutes a *waiver* of the right to compel arbitration. *Hooper v. Advance Am., Cash Advance Centers of Missouri, Inc.*, 589 F.3d 917, 922 (8th Cir. 2009), *abrogated in part on other grounds*, *Morgan v. Sundance, Inc.*, 596 U.S. 411, 142 S.Ct. 1708 (2022) (making it even easier to prove waiver of arbitration clause).

Plaintiffs brought this equivocation to the attention of the defendants and the Court in opposition to the defendants' motion to dismiss and compel discovery, pointing out the inherent inconsistency between simultaneously requesting an order compelling arbitration and an order of dismissal on the merits. (Dkt. 33 at 10). The defendants have done nothing to clear up the contradiction. Instead, they deliberately continue to play "heads I win, tails you lose" on the issue. *Hooper*, 589 F.3d at 922. This constitutes an "intentional act inconsistent with the right to compel

arbitration" which results in a waiver of that right. *Banq*, 2024 WL 4164126, at *1 (citation omitted).

Contrary to the defendants' assertions, the Supreme Court has recently "clarified that the pro-arbitration federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Morgan v. Sundance, Inc*., 142 S. Ct. 1708, 1713 (2022). Put differently, the pro-arbitration federal policy is simply "to make arbitration agreements as enforceable as other contracts, but not more so." *Id.* (citation omitted). "No longer is there a 'special' rule favoring arbitration*." Armstrong v. Michaels Stores, Inc*., 59 F.4th 1011, 1014 (9th Cir. 2023).

*Morgan* thereby overruled prior Ninth Circuit precedents in two respects. "First, *Morgan* teaches that [a]lthough the party opposing arbitration still bears the burden of showing waiver, the burden is no longer 'heavy.'" *Armstrong ,* 59 F.4th at 1014–15. "Second, as we recently noted, *Morgan* abrogates our precedents to the extent they required the party opposing arbitration to demonstrate prejudice." *Id*. at 1015 (citing *Hill v. Xerox Bus. Servs*., 59 F.4th 457, 468-69 (9th Cir. 2023). In light of the Supreme Court's abrogation of the previous rule strongly favoring arbitration, the defendants' conscious, ongoing decision to resolve the issues in this case in a judicial forum constitutes a waiver of their right to arbitrate.

Even if the Court were to compel arbitration, it cannot dismiss the case but may only stay proceedings and take a "supervisory role" to "assist the parties in arbitration." (Dkt. 33 at 9) (quoting *Smith v. Spizzirri*, 601 U.S. 472, 478, 144 S. Ct. 1173, 1178 (2024)). This supervisory role includes the "authority to grant injunctive relief to maintain the status quo pending arbitration," in order to "preserve the meaningfulness of the arbitral process." *Toyo Tire Holdings of Americas Inc. v. Cont'l Tire N. Am., Inc*., 609 F.3d 975, 979–80 (9th Cir. 2010). Likewise, this Court's authority

to grant Plaintiffs' requested preliminary injunction is essential because the arbitral process would be a hollow formality if the enjoined conduct – the dissipation of company assets stolen by the defendants – is allowed to continue until the defendants' motions are decided and an arbitrator appointed.

**C.      Plaintiffs Have Standing On Their Securities Fraud Claim Under the "Forced Sale" Doctrine**.

The defendantss assert that Plaintiffs Lack Standing because LLC Units are not Securities and No Sale Occurred.  They claim that because Mr. Boyle was a "Manager" under the Operating Agreement, his interest cannot be a security, and because he still physically holds his units no "sale" occurred.    (Defendants' Resp. pp. 18-20).   Their argument depends on a rigid, formalistic interpretation of the Securities Exchange Act roundly rejected by federal law, which looks to the "economic reality" of the relationship.

1.      *Under the* **Howey** *Test, the "Management Board" Rendered the LLC Units "Securities" by Stripping Plaintiff of Control*.

Defendants argue that an LLC interest is not a security. While this assertion is true for active managing members, it is **false** for members who have been structurally rendered passive.  Under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), an arrangement is an investment contract (and thus a security) if it involves: (1) an investment of money, (2) in a common enterprise, (3) with an expectation of profits derived solely from the efforts of others.

The issue at hand focuses upon the third prong – the "efforts of others." "What matters more than the form of an investment scheme is the 'economic reality' that it represents. The question is whether an investor, as a result of the investment agreement itself or the factual circumstances that

surround it, is left unable to exercise meaningful control over his investment." *United States v. Leonard*, 529 F.3d 83, 91 (2nd Cir. 2008). In *Leonard*, the Second Circuit "echo[ed] the Fifth Circuit in finding that investors may be so lacking in requisite expertise, so numerous, or so dispersed that they become utterly dependent on centralized management, counteracting a legal right of control," thereby converting his membership interest into a security. Likewise here, the defendants deliberately engineered a structure that fits the *Howey* and *Leonard* tests like a glove. By creating a "Management Board" that consisted of every director except the Plaintiff, the defendants structurally stripped Mr. Boyle of all meaningful control:

- The Admission: Defendant Southam admitted the purpose was to give Mr. Boyle "less visibility." (Plaintiffs' Supplemental Decl. ¶78, Exhibit 28).

- The Result: From the moment the Management Board was formed, Mr. Boyle became a passive investor dependent entirely on the "efforts of others" (the defendants) to realize any return. His interest, therefore, is a "security" subject to federal protection.

2.   *Defendants' Sham Sale in Dubai Constitutes a "Forced Sale" Because it Fundamentally Altered the Investment.*

The defendants argue that because Mr. Boyle still "owns" his 18% units, he has not "sold" anything and lacks standing (Defendants' Resp. p. 19). This argument ignores the "Forced Seller" doctrine. They assert that Plaintiffs must have "actually purchased or sold a security" to bring a claim. This argument fails to account for the Ninth Circuit's **"Forced Seller Doctrine."** In *Jacobson v. AEG Cap. Corp.* 50 F.3d 1493 (9th Cir. 1995), the Ninth Circuit recognized that " The forced sale doctrine relaxes the requirement that only traditional purchasers or sellers of securities

have standing to bring a Section 10(b) claim (*see, e.g. Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731, 95 S.Ct. 1917, 1923, 44 L.Ed.2d 539 (1975)). A shareholder who is forced to sell or alter her securities as the result of a fraudulent scheme is deemed a seller for purposes of the securities laws." *Id.* at 1499.

The doctrine applies precisely where, as here, a defendant's fraud or oppression renders the plaintiff's ownership completely worthless. The forced sale doctrine provides a cause of action under the securities laws to plaintiffs who are forced to convert their ownership of a minority yet meaningful ownership stake in a previously profitable and thriving company into the holder of a non-recourse note the payment of which is completely controlled by the Defendants themselves, essentially forced to fundamentally change the nature of plaintiffs' investments as the result of a fraudulent scheme. By stripping JIFU, LLC of all operating assets and converting the Plaintiffs' membership interest into a claim against a "worthless and illusory note," the Defendants have effectively forced a sale of the Plaintiffs' securities through fraud. The Defendants cannot hide behind the technicality that Plaintiffs still hold "title" to units that the Defendants themselves have rendered worthless.

**D.    Defendants' "Business Judgment Rule" Defense is Frivolous**.

As the Ninth Circuit held in *FDIC v. Castetter*, 184 F.3d 1040 (9th Cir. 1999), the BJR does not protect directors "where there is a conflict of interest, fraud, oppression, or corruption." *Id*. at 1046. The exception is rooted in the "continuing duty of loyalty," which prohibits a fiduciary from "represent[ing] an interest adverse" to their beneficiary in a substantially related matter. *Damron v. Herzog*, 67 F.3d 211, 213 (9th Cir. 1995). The business judgment rule also does not shield a

director who has "wholly abdicated his corporate responsibility." *Castette*r, 184 F.3d at 1046. A director abdicates his corporate responsibility by "closing his or her eyes to corporate affairs," *id*. at 1046, or "passively rubber-stamping the acts of the active corporate managers." *In re Comverse Tech., Inc.,* 56 A.D.3d 49, 56, 866 N.Y.S.2d 10, 17 (2008). *See also Edelman v. Fruehauf Corp*., 798 F.2d 882, 885-86 (6ᵗʰ Cir. 1986) (board committee's mere "rubber stamp" of proposal submitted by management rebuts business judgment rule).

Defendants' conduct fails on all counts to invoke the business judgment rule. The pretextual APA (Dkt. 1, 81, Ex. 20), which transfers all assets to an insider-controlled entity with no compensation to Boyle, is a paradigmatic example of a self-dealing transaction and a breach of the fiduciary duty of loyalty established above. Furthermore, the defendants' sham 15-minute meeting (Dkt. 1, 78) proves the directors did not deliberate but rather "closed their eyes" the reality of the transaction and rubber-stamped the sham sale, thereby abdicating their fiduciary duties. The defendants' fabricated minutes (Plaintiffs' Supplemental Decl. ¶138.) and the patently oppressive terms of the APA (Dkt. 1, Exhs. 20 and 21) are dispositive proof of the defendants' bad faith.

**E.      Dissolution is NOT an Exclusive Remedy.**

The defendants claim that the exclusive remedy for their minority oppression is a dissolution and unwinding. Again, they are mistaken. It is well established that an oppressed minority shareholder's stock should be valued as *pro rata* share of closely held corporation's going concern using rule of thumb formula, without consideration of any minority or marketability discounts that might have been applicable in other circumstances. *See, e.g., Hayes v. Olmsted & Assocs., Inc*., 173 Or. App. 259, 21 P.3d 178 (2001). *See also Brynwood Co. v. Schweisberger,* 393 Ill. App. 3d 339, 353, 913 N.E.2d 150, 162 (2009) ("While no Illinois court has so held, other jurisdictions agree that

dissenters' rights statutes that employ the term "fair value" require the trial court to value the dissenting shares by looking at what they represent—a percentage ownership in the intrinsic value of the corporation as a going concern.") (many citations omitted); *Brown v. Arp & Hammond Hardware Co.*, 141 P.3d 673, 687 (Wyo. 2006) ("We join the majority of courts in holding, as a matter of law, that a minority discount may not be applied in determining the fair value of a dissenting shareholder's interest.")

Finally, the "sale" of JIFU itself was a sham designed to circumvent securities laws. The defendants claim in their Response that the assets were sold to an independent third party, Unity Global (Defendants' Resp. p. 8; Southam Decl. 40). Plaintiffs' Supplemental Declaration Exhibit 40 (The Dubai DMCC Registry) proves that Defendant Kyle Copeland – a party to the Seller – is the "License Manager" (Statutory Manager) of the Buyer. This circular transaction confirms that the "liquidation" was merely a fraudulent transfer of value from the Plaintiffs to the defendants, cementing the status of the transaction as a *forced sale* under Rule 10b-5.

## II. ALTERNATIVE SERVICE IS NECESSARY UNDER FRCP 4(f)(3).

The defendants have failed to oppose Plaintiffs' request for alternative service on Defendant Danien Feier and his Entities, Seven Holding Limited, and Unity Global DMCC, UAE foreign entities. The motion therefore should be granted.

## CONCLUSION

Based on the foregoing, Plaintiffs request that their motion be granted.

DATED this 13th day of January, 2026.

WOOD LAW GROUP, PC

By: /s/ _____
T. Jason Wood, Esq.

14 -    REPLY IN SUPPORT MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (RULE 65), FOR ALTERNATIVE SERVICE (RULE 4(f)(3)), AND FOR OTHER RELIEF

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 13, 2026, I filed the foregoing electronically through the CM/ECF system, which caused all registered participants to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

WOOD LAW GROUP, PC


By:    /s/ _____
           T. Jason Wood, Esq.