T. Jason Wood, ISB No. 5016
WOOD LAW GROUP, PC
Jefferson Place, 5th Floor
350 North 9th Street, Suite 500
Boise, ID 83702
Tel: (208) 497-0400
Email: jason@woodlaw.net
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **TTAN, LLC**, a Utah limited liability company; and **BRADLEY J. BOYLE**, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> **KYLE J. COPELAND**, et al., <br><br> Defendants. | **Case N. 1:25-cv-00526-AKB** <br><br> **SUPPLEMENTAL DECLARATION OF BRADLEY J. BOYLE IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION TO STRIKE** |

I, **Bradley J. Boyle**, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Plaintiff in the above-captioned matter and a founding member of JIFU, LLC.

2. I submit this Supplemental Declaration to refute the demonstrably false statements contained in the Declarations of Paul Southam and Kyle Copeland and to correct the record regarding the Defendants' "revisionist history".

3. The Defendants have systematically severed my access to Company records to prevent me from defending myself. Consequently, I am relying on preserved contemporaneous communications (text messages, emails, and chats) which contradict the Defendants' sworn statements.

## I. PRELIMINARY REBUTTAL: THE FALSE NARRATIVES OF DISSOLUTION AND ASSET FREEZING

4. Defendants falsely argue that the winding up and dissolution of JIFU is effectively the same result as the APA, claiming that if the APA is voided, I would receive significantly less money. This is a fundamental mischaracterization of my position and the financial reality of the Company.

5. **I Am Not Seeking Dissolution:** I am not asking the Court to dissolve the company or stall its business operations. On the contrary, **I want the Company to be valuable, to operate, and to grow.** My goal is to ensure I receive **fair value for the ongoing concern** of the business operations, rather than allowing the Defendants to loot it for pennies on the dollar. The Defendants are using the threat of "dissolution" and "business destruction" as a straw man to justify a fraudulent transfer of assets to themselves.

6. **Gross Undervaluation:** The core issue is that the Company is worth far more than the $21,000,000 valuation assigned in the Asset Purchase Agreement (APA). Simple multiples of revenue or EBITDA demonstrate a value significantly higher than the APA price.

7. **The "Market Rate" Fallacy:** Defendants claim the APA establishes a "market rate" for JIFU's assets, "liquidated to a clean $21,000,000 note." This is false. JIFU is not a passive holding company; it is a **going concern that produces significant profit**. The $21 million figure is *their* valuation, derived from a transaction where they sat on both sides of the table as buyer and seller. I still do not know why they needed to sell the company, nor why they were the "ideal buyers" from themselves. It is commercially unreasonable that the valuation would drop to $21 million in the APA when, just months prior in December 2024, Defendant Paul Southam purchased Matt Garff's interest in an arms-length transaction that valued the company at over **\*\*$33 million\*\***. This massive drop in valuation occurred *despite* the fact that since December 2024, the company's profit and revenue have almost doubled and cash holdings have continued to grow **by the millions**.

8. **Evidence of Higher Value:** The Defendants' own transaction history contradicts their current valuation. In December 2024, Defendant Paul Southam (via 7 WRX, LLC) purchased Matt Garff's interest in Mango-JIFU, LLC for $10,000,000. Since Mango-JIFU owned 30.18% of the Company, this transaction valued the Company at **\*\*$33,134,526\*\*** ($10M / 0.3018). Yet, mere months later, they sold the *entire* company to themselves for a non-recourse note of only $21,000,000. It is commercially unreasonable and mathematically impossible for the company's value to plummet by over $12 million (~36%) in such a short period while simultaneously generating millions in profit. A true and correct copy of the **Membership Interest Purchase Agreement** establishing this $33M valuation is attached as **Exhibit 43**.

9. **Asset Preservation vs. Freezing Operations:** Defendants further claim that my request to freeze assets will negatively impact JIFU's value. This is false. I do not want to freeze the *operations* of the company; I want the company to grow and appreciate in value. I simply want my value preserved and protected from theft. A temporary restraining order preventing the transfer of assets to Dubai or the purchase of personal luxury real estate does not stop the company from selling travel or products, **which is their core business**. In fact, the Defendants' own accounting report (Richey May) shows significant cash balances of approximately **$7.9 million** as of December 5, 2025 (See **Exhibit 45**). This proves the Company has ample liquidity to operate normally without needing to siphon funds into personal accounts or foreign jurisdictions. My request is to stop the looting, not the business. Furthermore, the Defendants' offer to deposit my alleged share of distributions into the Court's registry is meaningless. Without access to the

unredacted financials, I have no ability to understand or verify their calculations. They control the inputs and the books; without transparency, they can manipulate the "distributable" amount to be zero, rendering their offer an empty gesture.

10. **The "Irony" of the Dubai Proposal:** Defendants argue that because the "initial idea" to move to Dubai came from me, my claims of harm and self-dealing are a "curious response." This is a cynical deflection. There is nothing curious about a founder objecting to theft. I **suggested discussing** moving operations to Dubai as a potential strategic expansion to leverage tax advantages and global trade hubs for the *benefit of all shareholders*. **I never proposed anything concrete; I simply suggested we should talk about it.** I did not propose, nor would I ever endorse, using that jurisdiction as a shield to strip the U.S. entity of its assets, destroy its going concern value, and rob owners of their rights and equity via a sham sale to insiders. Offering a strategy for legitimate growth is not consent to a strategy for looting.

11. **The "Schrödinger's Board Member" Paradox:** Defendants now claim that because a "second step" vote was never completed, I "continue to remain on the Board to current date." This is a fabricated legal fiction designed to trap me in a fiduciary duty without any of the rights or information that accompany it. How was I to know the "second step" was never finalized when they excluded me from every subsequent conversation? They stopped sending me financials, cut off my access to company systems, and hid critical information—such as the CXO Letter (See **Exhibit 27**) warning of regulatory failures— from me. The CEO, Kyle Copeland, clearly picks and chooses who sees what, hoarding information to keep me in the dark. They cannot have it both ways: they cannot treat me as fired to strip my rights and access, yet claim I am a Board Member to manufacture liability for their own mismanagement.

12. **The Fabrication of "Gross Negligence":** Defendants argue they were not engaging in "grossly negligent or reckless conduct" but were instead seeking to "protect JIFU from Boyle's mismanagement." This assertion is a transparent attempt to rewrite history. The specific instances they cite to establish this "history" of mismanagement—such as the marketing spend and the Globaleye contract—were actions taken with full Board knowledge, approval, and active participation, as demonstrated by the contemporaneous evidence provided in Section II below. These allegations of gross negligence are not historical facts; they have been **conjured up** by the Defendants to fit a **re-written history** designed solely to provide a pretext for their oppressive conduct and the fraudulent transfer of assets.

13. **The "Joke" of Regulatory Compliance:** Defendants attempt to dismiss text messages discussing "product loading" as mere "jokes" made by a distributor taking home expiring product. This defense is indicative of the Company's cavalier attitude toward federal law. The individual in question was under active investigation by the FTC. Joking about "product loading"—a serious regulatory violation—while under federal scrutiny is not a laughing matter. That the Company now defends this behavior in federal court as harmless "jest" confirms a culture where compliance is treated with derision rather than diligence.

14. **The Strategic Suppression of Information:** Finally, Defendants claim they "reasonably responded" to my financial requests and that I have failed to prove they refused

communications. This is demonstrably false. While Defendant Copeland *offered* to review financials in one instance (Plaintiff's Exhibit 13), he failed to honor that promise when I subsequently requested updated financials in July and August 2024. Those requests went unanswered. Their alleged "cooperation" is a mirage contradicted by their actions. In the May 2024 Board meeting, Defendant Paul Southam expressly admitted that the "Management Board" structure was designed to provide *less* visibility to me regarding company operations (See **Exhibit 28**). Furthermore, the Defendants' counsel, Cole Cannon, explicitly stated that I would not receive further distributions or access to QuickBooks unless I signed a new agreement containing an outrageous and unreasonable three-year global non-compete clause. Conditioning my statutory inspection rights and profit distributions on signing a restrictive covenant is not transparency; **it feels like pressure that is part of this squeezout.**

15. **The "Ex-Employee" Pretext for the Freeze-Out:** Defendants argue that cutting off my email and system access was acceptable because it would be "unusual" for "ex-employees" to retain such access. This argument epitomizes their bad faith and the contradictions in their narrative. I am not a normal "ex-employee." I am the Founder, a significant equity holder, and—according to their own legal arguments—a current member of the Board of Directors. Other Board Members (Southam, Symington, Copeland) retain full access to these systems. They conveniently label me an "ex-employee" when it serves their goal of freezing me out of company intelligence, yet label me a "Board Member" when seeking to assign liability. The fact that they defend this total lockout as standard procedure actually confirms the squeeze-out: they are treating a Founder and **alleged Director** as a terminated subordinate to strip me of the value and visibility I am owed.

16. **The "Independent Verification" Fallacy:** Defendants rely on the Richey May report to claim that no improper distributions have been made and that funds are not being used for personal expenses. They assert that the only money received by Southam, Copeland, and Symington has been for "management" since my termination. This claim is highly misleading. First, as shown in Section II, all prior distributions to me were approved by Southam and solidified in the January 2025 resolution (See **Exhibit 12**). Second, without access to the full, unredacted books, I am at their mercy to accept their definitions of "management fees" and "reasonable salaries." Are they asserting that Kyle Copeland receives *only* a management fee and no salary or bonuses? Was capital returned to them without being recorded as a distribution? The Richey May report itself shows significant "Management Fees" being paid out while I receive nothing (See **Exhibit 36**). **It even shows payments to Matt Garff—who is supposedly no longer a member. Given these irregularities, I have no way of knowing who is actually getting paid what.** By reclassifying distributions as fees, salaries, or bonuses, they can technically claim "no distributions" while still siphoning millions from the company. I have zero visibility to verify their claims, and their refusal to provide the underlying data speaks volumes.

17. **The False Narrative Regarding System Access:** Defendants argue that my email access was severed simply because I was terminated as CEO. This is false. I was removed as CEO in August 2024, yet I retained access to company systems for nearly seven months thereafter. My access was not revoked until **on or around March 6, 2025**—the specific

moment I refused to surrender additional equity to the Defendants and shortly before they voted to remove me from the Board. Furthermore, their assertion that I should have "informally worked it out" before filing suit is disingenuous. We repeatedly requested access through legal counsel, and those requests were refused. To claim they could not "read my mind" while they were actively denying my attorney's requests for information is a deliberate misrepresentation of the facts.

18. **Concealment of Assets and Evasion of Service:** Defendants attack my evidence of asset dissipation as "conjecture" and claim my references to Defendant Feier's location are "baseless." This argument ignores the direct cause of the evidential gap: the Defendants' refusal to provide transparency and financials since **March 2025**. I cannot "demonstrate" current asset flows because they have hidden the books. If the assets were secure, they could have simply provided the unredacted ledgers I requested; they did not. Furthermore, tracking **Danien Feier** is not about his lifestyle; it is about the fact that he is a named Defendant evading service of process while exercising "sole and exclusive" control over JIFU entities. **I personally provided Mr. Feier with the Complaint and a folder containing all filings in this case via WhatsApp. He has actual knowledge of this lawsuit, yet he continues to evade formal acceptance of service.** Without transparency, we cannot know what funds have already disappeared into accounts controlled by the very individuals who transferred the company's assets to themselves.

## II. PARAGRAPH-BY-PARAGRAPH REBUTTAL OF PAUL SOUTHAM'S THIRD DECLARATION

### Re: Paragraph 3 (The "Krazy Coupon Lady" Marketing Spend)

19. Mr. Southam alleges I paid $85,000 for the "Krazy Coupon Lady" promotion "without Board approval". This is false.

20. **The Call:** I specifically met with Paul Southam and Matt Garff over a conference call on or around January 27, 2022—not in person—to review this initiative in conjunction with "Rumor Advertising" for full efficiency. Both Southam and Garff gave their verbal consent on this call. A true and correct copy of the calendar invitation for this meeting is attached as **Exhibit 1**.

21. **The Text Evidence:** Board Member Scott Symington was also fully aware and enthusiastic. In a text regarding the launch of this exact campaign on March 7, 2022, Symington asked: **"Are we ready for the response?"**. This question clearly indicates his knowledge of the campaign and his anticipation of the traffic it would generate. A true and correct copy of this text is attached as **Exhibit 2**.

### Re: Paragraph 4 (The Globaleye Contract)

22. Mr. Southam alleges I signed the $49,000 Globaleye contract "without Board approval". This is false.

23. **Symington as Negotiator:** Scott Symington was involved intimately with the firm in a WhatsApp group with all direct communication about the contract. Symington acted as the Board's designated negotiator for this contract. He was included in direct communications with Globaleye's representative, Robert Halasz. Symington had a direct

call without me due to travel constraints on August 29, 2022. A true and correct copy of the WhatsApp log showing Symington's involvement is attached as **Exhibit 3**.

24. **Written Approval:** When the final terms were presented on September 2, 2022, I asked him if we were good with the contract. Symington replied via text with a single word: **"Oui"** (French for "Yes"). A true and correct copy of this text is attached as **Exhibit 4**.

25. **Garff's Involvement:** Former Chairman Matt Garff was also actively requesting updates. On July 29, 2022, I texted him a breakdown of the services, and he responded: *"Wow…, now you got me holding my breath….. Cool stuff."*. On September 6, 2022, I sent him a text confirming they were officially engaged and provided updates. To claim this was "unauthorized" is directly contradicted by the documentary evidence. A true and correct copy of this text exchange is attached as **Exhibit 5**.

26. **Effort to Recoup:** On December 13, 2022, I met with Rupert Searle at the Globaleye offices to try to return the money or find another account manager. After that meeting they no longer returned my calls or requests to meet with me for the next few months without any responses. A few months later the firm sold in a fire sale. To say I did not try to get the money back or get more services is not true. A true and correct copy of the record of this meeting is attached as **Exhibit 6**.

### Re: Paragraph 5 (The Capital Call)

27. Mr. Southam claims he was "reluctant" to fund the 2022 capital call and "did not negotiate terms," implying he was coerced.

28. **Strategic Growth, Not Survival:** The capital raise was not to keep the company "afloat". It was a strategic raise specifically to bring on new groups, to pay the salaries and terms for Kyle Copeland and Rod Larsen. (Note: Rod Larsen's equity tranche was later given to Danien Feier). The "JIFU Thoughts" document, which I sent to Paul Southam on **November 17, 2022**, outlines these specific deal points which included equity requests. A true and correct copy of the "JIFU Thoughts" document is attached as **Exhibit 7**.

29. **Character and Credibility:** Mr. Southam's sworn statement of "reluctance" is directly impeached by his contemporaneous messages. In a direct message to me on **November 22, 2022**, Southam stated: **"How does everyone feel about it? I'll kick in some money."**. A true and correct copy of this text exchange is attached as **Exhibit 8**.

30. **Architects of the Deal:** While I was in Dubai working to onboard the new teams, Paul Southam and Matt Garff (working with Matt Garff's in-house attorney Mark Richards) were back in the U.S. acting as the architects of the deal structure. They designed the note to favor their entities. The entire amount of the principal has been returned. True and correct copies of the Pincast Agreement and Mango-JIFU Agreement are attached as **Exhibit 9** and **Exhibit 10**, respectively.

### Re: Paragraph 6 (Loan Repayment Obstruction)

31. Mr. Southam claims he has not "prevented TTAN from repaying the loan". This is misleading.

32. **The "Illusory Note" Trap:** The Defendants have structured the Asset Purchase Agreement ("APA") to ensure that the Seller (JIFU US) never has the liquidity to make distributions, thereby making it impossible for me to service my loan obligations. A true and correct copy of the APA is attached as **Exhibit 11**.

33. **Payment Source Limitation:** Section 2(b) of the APA explicitly states: *"The entire Purchase Price... shall be paid solely and exclusively from the business profits generated by the Acquired Assets... Under no circumstances shall Buyer... be personally or corporately obligated to contribute... funds from sources other than such business profits."*.

34. **Optional Payments:** Section 6 of the APA creates a loophole where payments are legally required only if the "Management Board" determines they are possible. It states: *"If Buyer's profits... are insufficient, no distributions will be made."*.

35. **The Circular Control:** This structure is a sham because the "Management Board" that controls the Buyer's payments is comprised of the exact same individuals managing the Seller.

    1. **APA Recital F:** Establishes that the "Management Board" has *"all authority to run Unity Global DMCC [the Buyer]"* including *"controlling bank accounts, making distributions... and controlling the Chief Executive Officer."*

    2. **Member Resolution:** The Joint Member Resolution dated January 1, 2025, attached as **Exhibit 12**, confirms that **Kyle Copeland** and **Danien Feier** maintain *"sole and exclusive decisional control"* over the key Member entities.

36. **Conflict of Interest:** This creates an obvious conflict: Why would the Management Board (controlled by Copeland) voluntarily pay the Seller (managed by Copeland) when they can simply declare it "not prudent" and keep the cash in the UAE?

37. **Motivation to Default:** Since the only way I can pay off my debt is through distributions from the Seller, and the Seller's only income is this illusory, optional note, the Defendants have engineered a scenario where the Seller remains perpetually cash-poor. This ensures I cannot pay my loan, creating a pretext for them to seize my remaining equity.

38. **Attorney Statement:** When we asked for financials and the profit owed to me, Cole Cannon (their attorney) specifically stated that I (Bradley Boyle) *"won't be getting any more distributions"*. A true and correct copy of this communication is attached as **Exhibit 13**. Based on this, I can only assume that Paul Southam wants all my distributions to himself, not just the 25% required for loan repayment.

### Re: Paragraph 7 (The "Dubai Investment" Proposal)

39. Mr. Southam alleges I tried to set up a secret financial product in Dubai involving Forex traders.

40. **Alfa Financial Agreement:** This proposal involved **"Alfa Financial"** (https://www.alfafinancials.com/) and its subsidiary **"Al Mashriq Marketing Management."** Mr. Southam's claim that this was "secret" is demonstrably false. In the agreement with Islam Mohamed and Islam Wasfy called **"ADDENDUM #1 TO MARKETING COOPERATIVE AGREEMENT OF JIFU TRAVEL LLC"** (Attached as **Exhibit 14**) we spell out the profit splits. Furthermore, **Paul Southam** and our Middle East Director, **Anas Barbarawi**, physically went to the office and signed the Referral Agreement with Alfa's subsidiary on **January 14, 2023**. Additionally, **Paul Southam was part of the WhatsApp group** that included the negotiation and discussions with Alfa's attorneys. A true and correct copy of this signed **Referral Agreement** is attached as **Exhibit 46**.

Additionally, contemporaneous WhatsApp logs showing his inclusion in negotiations and presence at the signing are attached as **Exhibit 47**.

41. **Board Vetting:** Paul Southam and Danien Feier were intimately involved in all aspects of the deal including the splits and what would go in to the commission tree as well. Both men physically visited the Prime Group/Alfa Financial offices in Dubai at least twice to vet the opportunity.

42. **Outcome:** We ultimately decided not to do it because the technology did not line up. There was never a Board decree to shut it down; I did.

**Re: Paragraph 8 (Confidential Information)**

43. I deny this allegation. It is another attempt to disparage me without identifying what confidential information was revealed or to whom.

**Re: Paragraph 9 (The South American Payment)**

44. Mr. Southam alleges I negligently paid $107,000 to a "ghost" in South America in "November 2023".

45. **Timeline Correction:** This transaction occurred in **June and July 2024**, not November 2023.

46. **Stefania Lo Gatto's Request:** This payment was the issuance of "Credit Wallet" funds to seed the Brazilian market—a standard operating procedure for markets without robust credit card systems. This was done at the specific request of Defendant **Danien Feier** and his wife, **Stefania Lo Gatto**. A true and correct copy of the WhatsApp conversation with Stefania Lo Gatto explicitly asking for these credits is attached as **Exhibit 15**.

47. **Group Oversight:** The process was managed in a chat group titled *"Brazil (Pedro) VIP Support"* which included Defendant **Kyle Copeland (CEO)**, the recoupment team, and **at least ten other people**. A copy of this chat log is attached as **Exhibit 16**.

48. **Bad Faith:** I was fired **as CEO** just a few weeks after this transaction. For the Defendants to be aware of the needs of the market and label it "negligence" to justify my squeezeout—while simultaneously cutting off my access to the records that prove their involvement—is disingenuous and bad faith.

**Re: Paragraph 10 (The Alleged "Theft" / Overpayment)**

49. Southam claims I overpaid myself $18,165.93 without approval.

50. **True-Up Agreement:** I proactively showed the distribution calculations many times and received affirmative responses **from** Paul Southam. When the other partners **wanted** to change distribution processes, it was Southam who stated on **June 22, 2024**, *"No worries, lets get it ironed out and move forward"* after I sent him all the calculations via email, **but I no longer have those emails anymore**. A true and correct copy of this communication is attached as **Exhibit 17**.

51. **Evidence:** A spreadsheet created by **Scott Symington** identifies this exact amount as a "Due From Brad" item, proving it was a known, agreed-upon accounting adjustment, not misappropriation. This spreadsheet is attached as **Exhibit 18**. To label a known accounting entry as "theft" is a bad faith mischaracterization of the record.

**Re: Paragraph 11 (The Alleged $60,000 Distribution)**

52. Southam claims I distributed $60,000 to myself secretly.

53. **No Evidence:** The Defendants continue to repeat this falsehood despite being unable to produce a single bank statement or ledger entry proving it occurred.

54. **Fabrication:** In August, 2024 I sent an email specifically asking for more information regarding this alleged transaction. That email was never answered because the allegation is a fabricated lie. A copy of my inquiry email is attached as **Exhibit 19**.

**Re: Paragraph 12 (Misrepresentations to Copeland)**

55. Southam claims I made "misrepresentations to Copeland about ownership" without Board approval.

56. **Board Complicity:** The Board was fully aware of the equity situation. In fact, on **November 29, 2022**, Kyle Copeland explicitly told Matt Garff that his shares were not vested but asked if he could "put them up as collateral." The Board knew the status of Copeland's equity. A true and correct copy of this communication is attached as **Exhibit 21**.

57. On November 10, 2022, when I told **Paul Southam** it would take more equity to satisfy the teams, he replied, *"well that's an easy decision for me."*. A true and correct copy of this text message is attached as **Exhibit 20**.

58. **Drafting:** The Board designated **Scott Symington** to draft the "Profits Interest Units" (**IRS Section 4.01 of rev. Proc. 93-27, 1993-2 C.B. 343, as clarified by Rev. Proc. 2001 -34 I.R. B. 191**) agreements to satisfy these promises. True and correct copies of the **Danien Feier Agreement**, **Kyle Copeland Agreement**, and the **email from Scott Symington** transmitting these documents are attached as **Exhibit 22**, **Exhibit 23**, and **Exhibit 24**, respectively.

59. The Board knew everything about the equity situation; they simply wanted me to give up the equity to satisfy the requests **instead of fulfilling their own promises**.

**Re: Paragraph 13 (Boyle Removal)**

60. Southam says I was removed as CEO in September 2024.

61. **Wrong dates:** This happened in the beginning of August 2024.

**Re: Paragraph 14 (Boyle Removal/Equity)**

62. Southam says that the misrepresentations before I signed the severance agreement and gave up ownership required that I give up even more ownership. He then goes in to explain requests for me to give up even more ownership in the company to satisfy issues before the severance agreement.

63. Each of the dates he discusses are after I already gave up the ownership in the severance agreement and before we all signed the January 1, 2025 (**Exhibit 12**) member agreement codifying the issue.

64. Southam is conflating times and issues and conflicting his position to make me look dishonest.

**Re: Paragraph 15 (German Leaders leaving JIFU)**

65. Southam claims I caused "two JIFU leaders" in Germany to leave with 2,000 people.

66. **Fabrication:** This is a fabricated story to allege damages that do not exist. **I categorically deny this allegation.** The people I met with socially in Europe are still with JIFU. Notably, the Defendants **still do not say their names**, preventing any verification of this false

claim. These same leaders I met with have been seen with the other principals in this lawsuit since.

**Re: Paragraph 16 (Disparagement)**

67. Southam alleges I made disparaging or culturally offensive comments.

68. **Hearsay and Disparagement: I categorically deny these allegations.** This is, again, disparagement and hearsay without any proof. It is a vague character attack that has nothing to do with the case, designed solely to prejudice the Court.

**Re: Paragraphs 17 & 18 (DHP Allegations / Japanese Leaders)**

69. Defendants allege I started a competing company called DHP in "April 2025" and describe it as a "Metahorse betting scheme".

70. **Expiration of Restrictions:** The Severance Agreement I executed with the Company on September 25, 2024, contained a one-year non-solicitation provision (Section 8). My agreement did not contain any non-compete provision. A true and correct copy of this Agreement is attached as **Exhibit 25**.

71. **Timeline:** My obligations under that Agreement expired on September 25, 2025. I was not announced as CEO of DHP until September 28, 2025, three days after my contractual restrictions had lapsed.

72. **Right to Work:** Having stripped me of my income, distributions, and equity value through the oppressions detailed herein, the Defendants cannot now claim I am barred from earning a living to support my family after complying strictly with my one-year waiting period.

73. **Nature of Business:** The Defendants' description is false. We do not use Metahorse; that is a previous company. DHP is a blockchain-based gaming network, not gambling. It is not a betting scheme or a travel MLM, and it does not compete with JIFU's core business of trading, travel and physical products.

74. **Different Models:** To say the plans are similar is disingenuous; in the MLM industry, unilevel and binary plans are common. The DHP and JIFU plans are very different in percentages and limits. In addition, JIFU has a steady bonus, DHP does not. DHP has an orbit bonus paid daily and a BTC bonus. To say I took from this is disingenuous and a fabricated story trying to drag my name through the mud. Furthermore, the DHP compensation plan was designed and finalized before I was even hired. I have attached a comparison of the plans as **Exhibit 26**.

75. **Reason for Exodus (Japan):** The Japanese leaders left because JIFU ignored them. Specifically, in **December 2024**, Defendant Kyle Copeland reneged on a promise to visit them because he claimed he "had to teach Sunday school." Furthermore, they departed due to the Defendants' rampant disparagement of me. True and correct copies of text messages from 2024 and 2025 confirming these facts are attached as **Exhibit 42**.

**Re: Paragraph 19 (Board Member Status / The Scott Report)**

76. Defendants claim I am a "Board Member" to create liability, yet they exclude me from all critical information.

77. **The CXO Letter:** Looking back, they quickly created the "Management Board" when they received a critical compliance report from Brandon Scott (the "CXO Letter") **about the issues that the CEO Kyle Copeland was not addressing**. If I were truly a Board Member,

they would have provided this report to me. Instead, they suppressed it. A true and correct copy of this communication is attached as **Exhibit 27**.

78. **Authentication:** I received this document directly from Mr. Scott. If I were truly a Board Member, the Defendants would have provided transparency and discussed the grave regulatory warnings contained in this report; instead, they suppressed it and cut me off. Additionally, they never told me about the report or sent me a copy. Instead, they created a new governing body where Chairman **Paul Southam explicitly admitted** this "Management Board" was to create less visibility of the company for me. A true and correct copy of the Board Transcript verifying this admission is attached as **Exhibit 28**.

### Re: Paragraph 20 (The "Hacking" Allegation / Utah First)

79. Southam claims I "found a way" to view restricted accounts and "abused my power".

80. **Regulatory Requirement:** I did not "hack" this account; I established it. As a Director of the Credit Union for over a decade, I am intimately familiar with the Bank Secrecy Act (BSA) and Customer Identification Program (CIP) regulations. When establishing a bank account for a closely held entity, federal law mandates that the account be linked to the personal identity (SSN) of the individual opening it for beneficial ownership verification. Because I opened the account, it is legally attached to my personal online profile by banking regulations, not by any subterfuge.

81. **Failure to Act:** I explicitly informed the Defendants of this regulatory linkage in August 2024 and offered to assist them in the specific administrative process required to decouple my identity from the account. Despite these offers, no officer or Board or Management Board Member has ever followed up to effectuate this change. At no time was I told by the company that I could not have access to this account until Summer of 2024. To this day, I have still not been removed from the account and can see the account when I login to my personal accounts at the credit union. Furthermore, if I am a real board member with real board level fiduciary duties, why are they bringing this issue up?. A copy of my email explaining this to them is attached as **Exhibit 29**.

82. **UFCU Rules:** As a UFCU Board Member, I am not allowed to have access to accounts that are not in my name. I have never asked to see accounts that are not mine nor would I.

### Re: Paragraph 21 (Kingaru/KRU Allegations)

83. Southam claims I "failed to provide JIFU with critical information". Which is not true.

84. **Possession of Records:** The Defendants have all the accounting data. The company created all the information for the 2024 accounting with the firm **Eide Bailly** without my help or input. A true and correct copy of communication regarding the Eide Bailly accounting is attached as **Exhibit 30**.

85. **Knowledge of Meetings:** Paul Southam admitted in a text message on October 9, 2024: *"As for you I can't control you meeting with Brandon and Kyle."* This proves he knew I was trying to coordinate with the Global President ("Brandon") and the CEO ("Kyle"). I responded with, *"For me to do anything on KRU I need to meet with them, I will just wait then."*. A true and correct copy of this text exchange is attached as **Exhibit 31**.

86. **Refusal to Meet:** Copeland would always say he was too busy and even promised to meet with after the company cruise on November 9, 2024. He never did agree to meet

with me again face to face after this. A true and correct copy of the text declining the meeting is attached as **Exhibit 32**.

87. **Another Offer to meet:** In August 2024 right before the sham sale board meeting I provided much information for them and offered to sit down with anyone in the company to discuss any transactions, but they did not accept the offer. They responded with a lawsuit in Utah. A true and correct copy of this email offer—which also addressed the bank account removal (the "August Transparency Email")—is attached as **Exhibit 29**.

### Re: Paragraph 22 (Disparagement)

88. Southam claims I "intentionally contacted companies doing business with JIFU to disparage JIFU".

89. On the stated date of November 11, 2025, I was traveling and did not meet with any companies that were conducting business with JIFU.

90. Like many of their allegations they do not provide any information about the company, meetings, or any other information. **I categorically deny these allegations**.

### Re: Paragraph 23 (Disparagement to Distribution Partners about the FTC)

91. Southam says, *"Boyle falsely claimed that JIFU was being investigated by the FTC and informed them that Boyle planned to destroy JIFU"*.

92. **Denial:** I deny saying this and again, Southam does not provide any evidence of who, when and where I said such things.

### Re: Paragraph 24 (Valuation)

93. Southam states the sellers *"did a lot of research to come up to the value"* stating the valuation was fair.

94. **Due Diligence:** If this is the case why have they not provided that or shown it to me? If I was a board member as they state, I would have been provided this before the emergency board meeting in August.

95. **Proof of Valuation:** If they had proof that valuation was fair they would provide proof of the efforts, the names of the experts, outsiders or professional investors. In my experience outsiders would be very interested in a company that had around $10,000,000 in free cash flow with the kind of growth the company has had the last few years.

96. **Value:** Southam claims that *"the value was not well below the previously agreed value"* yet he signed an agreement to buy the shares from Matt Garff's shares in Mango- JIFU LLC on **December 1, 2024** at a value of the company worth 50% more than what it was sold 9 months later for $21,000,000. A true and correct copy of this **Membership Interest Purchase Agreement is attached as Exhibit 43**.

97. **Commercial Unreasonableness:** Why would the Board sell a company "**producing**" over **$1 million in cash per month** for a non-recourse note of $21M? A company with **$10 million in free cash flow** has massive inherent value. This valuation is indicative of a sham sale to insiders. Furthermore, using their own numbers from the accounting firm, the numbers increased significantly; why would the value go down?.

### Re: Paragraph 25 (Alignment)

98. Southam states that the APA "aligned Boyle with the rest of the members".

99. **No Alignment:** There is no alignment when Defendants pay themselves massive "Management Board" salaries while conditioning my distributions on oppressive terms. They have engineered a structure where they get paid regardless of profit, while I am starved of distributions.

**Re: Paragraph 26 (Severance/Competition)**

100.     Southam uses the phrase "After Boyle left JIFU". This is a false narrative designed to suggest I left on my own. I did not leave; I was **fired and squeezed out**.

101.     The Severance Agreement did not say I could not **compete**; it said I could not **recruit** from JIFU for 1 year, a covenant I honored. They are trying to hold me to board membership without including me in required board information to **push the oppression, not for any other reason**.

102.     The company **breached** my severance agreement when they fired me from the Board in March, quit providing me information and access, and failed to fulfill all conditions in the agreement. This includes failing to provide **dental care benefits**. They also **quit paying me on August 29, 2025**, and failed to pay me all the way through the severance agreement once they filed the suit in Utah. A true and correct copy of my last paycheck is attached as **Exhibit 50**.

103.     **Unexplained Wire:** In June 2024, they made a wire for **$324,500 to Marrone Law Group** (See **Exhibit 33**). If I was a Board Member, I would know what this was for and why it was sent out. The fact that they hide this expense suggests it may be for personal legal defense fees paid with company funds. This is just another example of them trying to say I am a board member but never giving me any information. They want to try to hold me to a false narrative but they constantly show that they are the ones who are not transparent.

**Re: Paragraph 27 (Email Access/Retaliation)**

104.     Southam states Boyle's access to his JIFU email account was severed in response to his termination as CEO and manager. It would be unusual for JIFU to allow ex-employees to retain access to company accounts.

105.     **Retaliation:** My access was not limited when I was fired as CEO. It was removed **on or around March 6, 2025**, specifically after I refused to "give away" my equity to Copeland for free.

106.     **Fabrication:** Defendant Scott Symington (a Board Member) retains full access. Their claim that this was a standard termination procedure is a post-hoc fabrication designed to make their story work. I was not just an employee but supposedly a Board Member, and they took it away because it had vital information. Why should I have to ask for all these things if they are given to other members of the board including financials and key information?.

**Re: Paragraph 28 (Proxy Denial)**

107.     Southam states, "At the August 19, 2025, Board meeting, Boyle's proxy, Shamim Ahmed failed to appear".

108.     **Calculated Exclusion:** Defendants explicitly told my proxy, Shamim Ahmed, he could not participate in the board meeting via email but would confirm, he never confirmed, then cynically acted surprised when he did not appear. This was a

manufactured default and revisionist history. A copy of these emails is attached as **Exhibit 34**.

## II. REBUTTAL TO RICHEY MAY ACCOUNTING REPORT

109.    **The Travel Expense Allegation ($79,480):** Table 4 of the Richey May Report (See **Exhibit 45**) claims I spent $79,480 on travel. This is materially false. I was on severance during much of this period. My only authorized travel expense was approximately **$5,207.82** for the Japan trip using the company AMEX. I also submitted an expense for an airplane ticket to Munich for the event in the Spring of 2024, where I was on the speaking schedule; however, after I was fired from the Board, my expense was denied. I deny receiving the other ~$74,000. I believe the Defendants have misclassified other payments or fabricated this number to paint me as fiscally irresponsible. Copies of my AMEX statements for this trip are attached as **Exhibit 35**.

110.    **Travel Discrepancy:** The report also shows Board Member Scott Symington incurred higher travel expenses ($9,628) than the CEO Kyle Copeland ($6,211). This anomaly further suggests that 'expenses' are being misclassified.

111.    **Management Fee Siphoning:** The Report confirms that while I received $0 in Management Fees, Defendants Southam, Copeland, and Symington each received **$166,250** in fees plus severance. Additionally, for some reason, **Matt Garff**—who is supposedly no longer a member—received **$156,250**. This confirms the "squeeze out" mechanism: they extract cash as "fees" rather than "distributions" to bypass my 18% equity interest. See **Exhibit 36**.

112.    **Undervaluation Confirmed:** Defendants' own expert confirms JIFU generated roughly **$6.7 Million in Net Income** (9% of $70M sales) over the last period (See **Exhibit 45**). Selling a company with $6.7M in annual profit and $7.9M in cash for a **$21M non-recourse note** is commercially unreasonable on its face.

## III. PARAGRAPH-BY-PARAGRAPH REBUTTAL OF KYLE COPELAND'S DECLARATION

**Re: Paragraph 2 (Copeland Position)**

113.    Mr. Copeland states that he is a Board Member and became CEO in October 2024. This is not true. He became CEO in **August 2024**, and I do not know when he was allegedly elected to the Board.

114.    **Operating Agreement Violation:** Under the Company's Amended and Restated Operating Agreement (dated Oct 17, 2023), specifically **Sections 4.3 (Notice of Meetings)** and **5.4 (Regular Meetings of the Board)**, I was entitled to written notice of any meeting where a vote to appoint a new Director occurred. If I was truly a Board Member, I would have been invited to such a meeting, but I never was, nor have I seen any Board meeting minutes that explain this appointment. As a Board Member and significant Shareholder, excluding me from such a meeting violates the express terms of the Operating Agreement and renders such action void. I received no notice of any meeting to elect Mr. Copeland to the Board. A true and correct copy of the Operating Agreement is attached as **Exhibit 37**.

**Re: Paragraph 3 (Proposal to Relocate)**

115.    Copeland states, I "proposed that JIFU relocate to Dubai".

116.    **Context:** While I did discuss the logistical benefits of a Dubai presence (tax-free zone, home for KRU), I did not propose it as a mechanism to squeeze me out or for everyone else to extract management fees and leave me out. My proposal was for legitimate business expansion including everyone, not the fraudulent asset stripping scheme the Defendants ultimately executed. A copy of the communications regarding this proposal is attached as **Exhibit O**.

### Re: Paragraph 4 (Tax and Regulations)

117.    Mr. Copeland claims the move was for business rationale. However, the Asset Purchase Agreement (APA) itself explicitly states the move is to avoid tax and regulations of the United States. A true and correct copy of the APA is attached as **Exhibit 11**. I do not know the "real" reason for the final structure because I was never part of those discussions.

### Re: Paragraph 5 and 6 (International Sales)

118.    I have not been presented with any information that would verify this information.

### Re: Paragraph 7 (Information Requests)

119.    Mr. Copeland claims he provided information when requested. This is false. We have requested information through our attorney, and he has denied us. If I were truly a Board Member, I should not have to ask for basic corporate records through legal counsel.

### Re: Paragraph 8 (Financial Statements)

120.    Mr. Copeland claims he provided financials and offered to send more. He never sent April and May finals, and he has not provided anything after that. If I was treated like a real board member I would be given this information without requests. Even with requests through counsel the information has not been provided.

### Re: Paragraph 9 (Email Access)

121.    Mr. Copeland claims my email was cut off upon termination I assume as CEO. This is misleading. It was cut off after I told them I would not be giving away any more equity to him without real compensation, not when I was fired from the company. As a Board Member—like Defendant Scott Symington—why did I get cut off while he did not? This disparate treatment proves the retaliation and confirms that I was fired as a board member.

### Re: Paragraph 10 (FTC Compliance / Product Loading)

122.    Mr. Copeland dismisses a text about product loading as a "joke". As CEO, taunting the FTC is no laughing matter.

123.    **Regulatory Recklessness:** This cavalier attitude is particularly alarming given that Defendant Copeland recently hired **Alex Morton** and **Matthew Rosa** as key sales leaders. Both individuals are named defendants in the active federal enforcement action *Federal Trade Commission v. International Markets Live, Inc., et al.*, Case No. 2:25-cv-00760 (D. Nev.). A copy of the relevant docket/complaint is attached as **Exhibit 38**. Hiring individuals currently being sued by the FTC while dismissing compliance warnings as a "joke" demonstrates a reckless disregard for the regulatory safety of the Company.

**Re: Paragraph 11 (FTC Audits)**

124.        Mr. Copeland claims they hired firms for FTC compliance. If I was actually on the Board, I would be aware of this. I have never seen a report or any information regarding this, further proving my exclusion from the Board.

**Re: Paragraph 12 (Richey May Report)**

125.        Mr. Copeland relies on the Richey May report (See **Exhibit 45**) to validate the Company's financials, but the report itself reveals critical discrepancies that support my claims. If I was a Board Member, they would have provided this information to me directly, not just a report that has been scrubbed for litigation.

126.        Additionally, the fact that they are claiming I spent $79,480 on travel (when I spent ~$5,207 on an authorized AMEX) makes me question their accounting professionalism entirely. I deny receiving the other $74,273 in travel reimbursements. This figure is either fabricated or misclassifies severance/other payments as 'travel' to inflate my spending. I demand the general ledger detail for this line item.

127.        I also question that Board Member Symington travelled more than Kyle Copeland as CEO.

128.        The Auditor's search for payments to 'Jacob & Co' is too narrow. The funds were likely siphoned through 'Management Fees' **and probably high bonuses as well** paid to the individual Defendants (which the report confirms are massive) or transferred to the Dubai entity first before purchasing real estate. The report confirms $7.9 Million in cash; it does not track where the 'Management Fees' went after leaving JIFU accounts.

129.        Defendants' own expert confirms JIFU generated ~$6.3 Million in Net Income over the last year. Selling a company with $6.3M in annual profit and $7.9M in cash for a $21M non-recourse note (only ~3x earnings) confirms the valuation is commercially unreasonable and a sham.

**Re: Paragraph 13 (Personal Funds)**

130.        Mr. Copeland denies using company funds. We never said he used company funds directly; we stated he has been the beneficiary of management fees, bonuses, and salaries derived from the company.

131.        Furthermore, we are stating that he bought a place in Dubai after moving all assets to Dubai. In his declaration he does not deny buying property or any of the complaint. The luxury property marketing material is attached as **Exhibit 39**.

**Re: Paragraph 15 (Receiver Purpose)**

132.        Mr. Copeland argues a receiver would destroy the business. I do not want to destroy the business; I want to preserve the assets that were misappropriated from me and ensure the company is not emptied before a judgment can be rendered and I am compensated for the tort that we are pleading.

## IV. THE SHAM TRANSACTION

133.        The transfer of assets to "Unity Global" is a sham. The entity is legally registered as **JIFU GLOBAL FZCO**.

134.    **Official Records:** Official DMCC records list Defendant **Kyle Copeland** as the "License Manager" of the buyer. A copy of this registry is attached as **Exhibit 40**. This proves Copeland sat on both sides of the table: he signed the sale as CEO of the Seller (JIFU US) and controls the assets as Manager of the Buyer (JIFU Global).

135.    **Lack of Diligence:** Even key partner Danien Feier admitted in a message regarding the financials: *"No I have not."*. He did try to cover this up but Feier sent this to me in text, stating: *"Unfortunatley I have no influence over what Paul and his lawyers are filing. They are not involving me"*. This further proves that Paul Southam, Kyle Copeland, and Scott Symington are running the company and that the sale was a sham and a smokescreen to strip me of my ownership. A true and correct copy of this exchange is attached as **Exhibit 41**.

## V. RESPONSE TO ALLEGATIONS OF DELAY

136.    Defendants claim I delayed filing a TRO because it was not important. This is false. Although I had access to the APA, the full extent of the fraudulent scheme and the sham nature of the transaction were not apparent at that time. I attempted to resolve this through information requests, which were stone-walled.

137.    The 'emergency' is the realization—confirmed by the Defendants' refusal to provide unredacted financials and the discovery of the DMCC registry—that the assets are being moved beyond the jurisdiction of this Court *now*, offices are being built out, and personal luxurious apartments are being purchased in Dubai. Information about the properties in Dubai is in **Exhibit 39**.

## VI. ADDITIONAL REBUTTALS

### Re: August Board Minutes

138.    In defendants complaint they say that the board minutes sent out in August were just drafts. Nowhere in the first email or the email sent out in September did they say this was a draft. They are trying to cover their tracks and revise the actual facts of the situation.

### Re: Failure to Update Corporate Records

139.    Defendants blame me for the bank account names not being changed. I was removed as CEO in August of 2024. They have had months to update bank signatories and names but failed to do so as well as to change the name. This is their negligence, not mine.

### Re: Fired from the Board

140.    I was fired from the Board of Directors on March 12, 2025. During a Special Board Meeting on that date, a motion was made and voted upon to remove me (See **Exhibit 49**). Despite my prior written objections that such removal was invalid under the Operating Agreement (See **Exhibit 48**), the Defendants proceeded with the vote. I was excluded from all subsequent meetings, decisions, and information. The Defendants' current attempt to claim I am still a Board Member is a calculated contradiction designed solely to manufacture fiduciary liability against me for decisions they made after firing me. A transcript of this meeting is attached as **Exhibit 49**.

### Re: Use of Likeness / Headshot

141.    Defendants complain about my use of my own professional headshot. This argument is ridiculous. The Company continues to use my image on the official JIFU website to promote the business, yet they simultaneously claim I am unauthorized to use my own likeness on my personal LinkedIn profile. They cannot have it both ways— using my image to solicit trust while suing me for using my own face. A true and correct copy of my LinkedIn profile using this headshot is attached as **Exhibit 44**.

The Defendants' continued disparagement of me in the public court record without proof is damaging my reputation, my family, and my future work opportunities. I respectfully request that the Court hold them responsible for such actions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: January 3, 2026

*Bradley J Boyle*

box SIGN          4KP5Q663-4LX33P66

**Bradley J. Boyle**


EXHIBIT LIST
- **Exhibit 1:** Discussion with Matt Garff and Paul Southam regarding Krazy Coupon Lady (January 27, 2022)
- **Exhibit 2:** Text Message from Scott Symington in regards to Krazy Koupon Lady (March 7, 2022)
- **Exhibit 3:** WhatsApp Log showing Symington as Negotiator and being part of the Globaleye contract (August 29, 2022)
- **Exhibit 4:** Text Message from Scott Symington in regards to his approval ("Oui") of the Globaleye contract (September 2, 2022)
- **Exhibit 5:** Text Message from Matt Garff about his excitement and anticipation of working with Globaleye (July 29, 2022)
- **Exhibit 6:** Text messages with Globaleye President Rupert Searle and efforts to get money back with a meeting (Dec 13, 2022)
- **Exhibit 7:** "Jifu Thoughts" Document sent to Paul Southam via text (November 17, 2022)
- **Exhibit 8:** Text from Paul Southam and his excitement for new groups ("I'll kick in some money") (November 22, 2022)
- **Exhibit 9:** TTAN promissory note to Pincast (January 2023)
- **Exhibit 10:** TTAN promissory note to Mango-JIFU LLC (January 2023)
- **Exhibit 11:** Asset Purchase Agreement (APA) (Non-Recourse Note) (August 2024)
- **Exhibit 12:** Joint Member Resolution dated January 1, 2025

- **Exhibit 13:** Communication from Cole Cannon ("won't be getting any more distributions") (2024/2025)
- **Exhibit 14:** Addendum #1 to Marketing Cooperative Agreement (Islam Mohamed/Wasfy) (2022/2023)
- **Exhibit 15:** WhatsApp Conversation with Stefania Lo Gatto regarding Pedro Malouf (Asking for Credits) (June/July 2024)
- **Exhibit 16:** "Brazil Pedro VIP Support" Chat Log (June/July 2024)
- **Exhibit 17:** Southam "No worries" Text on differences of distributions (June 22, 2024)
- **Exhibit 18:** Spreadsheet by Scott Symington (Showing "Due From Brad") (January 2025)
- **Exhibit 19:** Email from Boyle inquiring about the alleged $60,000 transaction (August 2024)
- **Exhibit 20:** Text from Paul Southam about giving up more equity ("well that's an easy decision for me") (November 10, 2022)
- **Exhibit 21:** Communication with Kyle Copeland and Matt Garff discussing Equity (November 29, 2022)
- **Exhibit 22:** Danien Feier Agreement Profits interest agreement (February 5, 2023)
- **Exhibit 23:** Kyle Copeland Agreement interest agreement (January 1, 2023)
- **Exhibit 24:** Scott Symington Email transmitting Danien Feier Agreement (January 2023)
- **Exhibit 25:** Boyle Severance Agreement dated September 25, 2024
- **Exhibit 26:** Comparison of JIFU vs. DHP Compensation Plans (Undated)
- **Exhibit 27:** Report of Brandon Scott CXO Letter (May 2024)
- **Exhibit 28:** Transcript of May 2024 Board Meeting
- **Exhibit 29:** August Transparency Email regarding removal from Bank Accounts and Offer to Meet (August 2024)
- **Exhibit 30:** Evidence of Eide Bailly/Accounting Data for KRU (August 2025 and October 2023)
- **Exhibit 31:** Southam Text about not forcing team to meet with me about KRU (October 9, 2024)
- **Exhibit 32:** Copeland Refusal to meet till after Cruise, then never did (November 9, 2024)
- **Exhibit 33:** Wire Transfer Receipt to Marrone Law Group ($324,500) (June 2024)
- **Exhibit 34:** Emails showing exclusion of Proxy Shamim Ahmed from August 2025 Board Meeting
- **Exhibit 35:** AMEX Statements for Japan Trip of December 2024
- **Exhibit 36:** Table: Management Fee vs. Severance from accounting firm (The Looting Scheme) (2024/2025)
- **Exhibit 37:** Amended and Restated Operating Agreement (October 17, 2023)
- **Exhibit 38:** Complaint/Docket from FTC v. International Markets Live (Naming JIFU's new distributors) (2024/2025)
- **Exhibit 39:** Ohana by Jacob Luxury Property Marketing Material where Copeland and Feier bought luxury apartments (Dubai Real Estate) (2024/2025)
- **Exhibit 40:** Register of DMCC Entities (Proof of JIFU Global FZCO / Copeland Manager) (Current)
- **Exhibit 41:** WhatsApp Exchange with Danien Feier (2024/2025)

- **Exhibit 42:** Text messages regarding Japanese Leaders (2024-2025)
- **Exhibit 43:** Membership Interest Purchase Agreement of Mango-JIFU (December 1, 2024)
- **Exhibit 44:** Screenshot of Bradley Boyle's LinkedIn Profile (Headshot)
- **Exhibit 45:** Richey May Report (December 23, 2025)
- **Exhibit 46:** Referral Agreement between Al Mashriq, Strong Guarantor, and Jifu UAE (January 14, 2023)
- **Exhibit 47:** Alfa Financial Communications (WhatsApp/Texts regarding negotiations and signing) (January 2023)
- **Exhibit 48:** Response to Board Meeting Request (Email draft from Brad Boyle)
- **Exhibit 49:** JIFU Special Board Meeting Transcript to Remove Brad Boyle (March 12, 2025)
- **Exhibit 50:** Last Paycheck from JIFU (August 29, 2025)