T. Jason Wood, ISB No. 5016
WOOD LAW GROUP, PC
Jefferson Place, 5th Floor
350 North 9th Street, Suite 500
Boise, ID  83702
Tel: (208) 497-0400
Fax: (208) 932-4380
Email: jason@woodlaw.net

Shamim J. Ahmed, NYSB No. 4857298
FIRST LOOK LAW, PLLC
133 Swamp Rd
East Hampton, NY 11937-2559
(Suffolk County)
Tel: (917) 428-2785
Email: shamim@firstlook.law

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **TTAN, LLC**, a Utah limited liability company; and **BRADLEY J. BOYLE**, an individual,<br><br>     Plaintiffs,<br><br>v.<br><br>**KYLE J. COPELAND**, *et al.,*<br><br>     Defendants. | Case No. 1:25-cv-00526-AKB<br><br>**PLAINTIFF'S REPLY IN SUPPORT MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (RULE 65), FOR ALTERNATIVE SERVICE (RULE 4(f)(3)), AND FOR OTHER RELIEF (Dkt. 40)** |

## INTRODUCTION

Defendants attempt to portray this case as a routine employment dispute involving a "disgruntled" former CEO. They ask this Court to stand down based on the "Business Judgment Rule" and an arbitration clause. This narrative is destroyed by the Defendants' own documents, which reveal not a business dispute, but a documented corporate theft in progress.

If this were a legitimate business disagreement, the Defendants would not have needed to create a "Management Board" that excluded only the Plaintiff to hide their actions. (*See* Plaintiffs'

---

Supplemental Decl. ¶ 14, Exhibit 28). If this were a legitimate asset sale, the Seller (JIFU) would not have paid the Buyer (Unity Global) $5,000,000.00 to take the assets. (See APA, Complaint Exhibit 20, § 2(b)).

The "Business Judgment Rule" protects directors who make difficult decisions; it does not protect fiduciaries who sell the Company's assets to an entity they control for "negative consideration." The "Asset Purchase Agreement" attached to the Complaint admits that Defendants engaged in a Fraudulent Transfer by moving $5 million in liquid cash and the Company's entire intellectual property portfolio to a Dubai entity managed by Defendant Kyle Copeland. (See Supplemental Decl. Exhibit 40).

Furthermore, Defendants have engineered an imminent, irreparable "Tax Squeeze" against the Plaintiffs. By retaining between $7.9 million (per the "Richey May Report") and $12.9 million in cash while refusing to make the mandatory tax distributions required by Section 3.6 of the Operating Agreement, Defendants are forcing Mr. Boyle to incur massive personal tax liability on "phantom income" without the cash to pay it. This is a textbook oppression tactic designed to bankrupt a minority member.

Finally, a massive discrepancy between the Defendants' own exhibits-the $7.9 million listed in the Richey May Report (Doc. 47-7) versus the $5 million outflow listed in the APA-creates a "forensic black hole." It is impossible to know if the Company holds $7.9 million or $12.9 million, or if the funds have already been wired to the UAE. Defendants' refusal to provide books and records, justified by the demonstrably false claim of "security concerns" (See Copeland Decl. 9 vs. Supplemental Boyle Decl. ¶17), confirms that they are hiding the flow of funds.

The question before the Court is not whether the merits of this dispute belong in arbitration. The question is whether there will be any assets left to arbitrate. Unless this Court issues a Temporary Restraining Order to freeze the status quo, the Defendants will complete the looting of JIFU, LLC, rendering the arbitration a hollow formality and leaving Plaintiffs with a worthless interest in an empty shell.

## I. DEFENDANTS' TERMINATION OF MR. BOYLE WAS NOT AN EMPLOYMENT DECISION; IT WAS THE FIRST STEP OF A CALCULATED SQUEEZE-OUT.

The defendants' briefing and their supporting declarations focus extensively on why they believe Mr. Boyle was a "bad boss."  This is legally irrelevant.  Mr. Boyle does not claim any damage or injury arising from his employment as CEO of the Company.  (See Dkt. 1).  Rather, his claims arise from his status as member and 18% owner of the Company, which is worth more than $30 million by the defendants' own agreed value.  Even if Mr. Boyle were the worst CEO in history (which he was not), that does not give the defendants the right to unilaterally misappropriate his multi-million dollar ownership interest in the Company.

The defendants' remedy for Mr. Boyle's allegedly poor work performance was to remove him as the CEO, which they in fact did. 2 If they want an offset or damages arising from Mr. Boyle's conduct as CEO of the Company, they are free to answer the complaint and allege a counterclaim accordingly. They have chosen not to do so.  Unless and until they do, Mr. Boyle's work performance as the Company CEO is entirely irrelevant to any of the claims alleged in the Complaint or issues raised in Plaintiffs' motion for TRO.  Any and all such factual averments in their declarations should be stricken and otherwise disregarded.

If the Court is inclined to consider the defendants' irrelevant and prejudicial factual assertions, and in any case to set factual record straight, it is imperative to not that the defendants'

declarations are demonstrably impeached by their own contemporaneous communications. Plaintiffs direct the Court's attention to Mr. Boyle's supplemental declaration filed herewith, in which he systematically refutes the defendants' factual assertions with documentary proof.

Defendants devote the entirety of their "Factual Background" (Defendants' Resp. 1-11) and the bulk of the Declaration of Paul Southam to attacking Mr. Boyle's performance as CEO. This entire line of argument is a legal nullity. Defendants are attempting to defend against the tort of Minority Oppression by citing irrelevant employment grievances.      They seem genuinely shocked there are legal limits on their ability to oppress a minority member.  Well established law in that regard acts as a "bill of rights" for minority owners in closely held business entities.

**A.**     *Steelman* **Defines Termination as Oppression, Not Business Judgment**

"Squeeze-outs, sometimes called freeze-outs, are actions taken by the controlling shareholders to deprive a minority shareholder of his interest in the business or a fair return on his investment." *McCann v. McCann*, 152 Idaho 809, 815, 275 P.3d 824, 830 (2012) (citing *Balvik v. Sylvester*, 411 N.W.2d 383, 386 (N.D.1987). "Because of the predicament in which minority shareholders in a close corporation are placed by a squeeze-out situation, courts have analyzed alleged 'oppressive' conduct by those in control in terms of 'fiduciary duties' owed by the majority shareholders to the minority and the 'reasonable expectations' held by the minority shareholders in committing their capital and labor to the particular enterprise." *Id.* (quoting *Balvik*, 411 N.W.2d

Idaho case law is clear on the fiduciary duty owed by directors.  "As fiduciaries, corporate directors are bound to exercise the utmost good faith in managing the corporation. However, the 'business judgment rule' immunizes the good faith acts of directors when the directors are acting

within the powers of the corporation and within the exercise of their honest business judgment." *Steelman v. Mallory*, 110 Idaho 510, 513, 716 P.2d 1282, 1285 (1986) (internal citations omitted). "In Idaho a director has a fiduciary responsibility to both the corporation and to shareholders." *Weatherby v. Weatherby Lumber Co.,* 94 Idaho 504, 506, 492 P.2d 43, 45 (1972). More specifically, "[t]hat the directors of a closely held corporation owe a fiduciary duty to the minority shareholders is well recognized.'" *Jenkins v. Jenkins*, 138 Idaho 424, 428, 64 P.3d 953, 957 (2003) (quoting *Steelman*, 110 Idaho at 513, 716 P.2d at 1285).

In *Steelman*, a shareholder of a closely-held corporation filed suit against the two controlling shareholders, alleging a breach of fiduciary duty. An individual action was allowed where the directors breached their fiduciary duty by usurping an opportunity that existed and would have been performed by the corporation but for a disagreement amongst the directors. *Steelman*, 110 Idaho at 513–14, 716 P.2d at 1285–86. *Steelman* held that in a closely-held corporation, the corporate directors owe a fiduciary duty to one another, to the corporation and to the shareholders, including the minority shareholders. *Id.* at 513, 716 P.2d at 1285. "Since Mallory and Jensen, as directors in this small closely held corporation, had a fiduciary duty to Steelman, as a minority shareholder, we cannot agree with appellants' contention that this case should have been dismissed because it is a 'direct action' rather than a shareholder's derivative suit." *Id*.

"The holding in *Steelman* is consistent with holdings from other states and legal authorities. A well-recognized exception to the rule that a shareholder must bring a derivative action for claims alleging injury to the corporation is that in a closely held corporation a minority shareholder may bring a direct action, rather than a derivative action, if the shareholder alleges harm to himself distinct from that suffered by other shareholders of the corporation or breach of a special duty owed

by the defendant to the shareholder." *McCann,* 152 Idaho at 815–16, 275 P.3d at 830–31 (citing *Cunningham v. Kartridg Pak Co.*, 332 N.W.2d 881 (Iowa 1983) (citing *Thomas v. Dickson*, 250 Ga. 772, 301 S.E.2d 49 (1983); *Russell v. First York Savings Co.*, 218 Neb. 112, 352 N.W.2d 871 (1984), *overruled on other grounds in Van Pelt v. Greathouse*, 219 Neb. 478, 364 N.W.2d 14 (1985); *Crosby v. Beam*, 47 Ohio St.3d 105, 548 N.E.2d 217 (1989); *Horizon House–Microwave, Inc. v. Bazzy*, 21 Mass.App.Ct. 190, 486 N.E.2d 70 (1985); *Schumacher v. Schumacher*, 469 N.W.2d 793, 798 (N.D.1991); *Action in Own Name by Shareholder of Closely Held Corporation*, 10 A.L.R. 6th 293 § 13 (2006)).

"As fiduciaries, corporate directors are bound to exercise the utmost good faith in managing the corporation." *Steelman*, 110 Idaho at 513, 716 P.2d at 1285 (citing *Great Western Producers,* 41 Colo.App. 349, 588 P.2d 380, 382 (1978), *aff'd,* 200 Colo. 180, 613 P.2d 873 (1980); *Poweroil Mfg. Co. v. Carstensen*, 69 Wash.2d 673, 419 P.2d 793, 796 (1966)).

"**Typically, relief has been granted in non-fraud oppression cases where the majority has engaged in squeeze-out conduct**." *McCann*, 152 Idaho at 816, 275 P.3d at 831 (citing *Balvik*, 411 N.W.2d at 387; *Landstrom v. Shaver*, 561 N.W.2d 1, 10 (S.D.1997)). The Idaho Supreme Court has recognized taht "[t]he majority shareholders can apply numerous means to accomplish the squeeze-out.  Holders of a majority of the voting shares in a corporation, through their ability to elect and control a majority of the directors and to determine the outcome of shareholders' votes on other matters, have tremendous power to use a great variety of devices or modes of operation to benefit themselves at the expense of minority shareholders." *McCann*, 152 Idaho at 816, 275 P.3d at 831 (citation omitted).

The Supreme Court has provided "a few illustrations[:] The squeezers may cut off the flow

of income to the minority by refusing to declare dividends or they may deprive minority shareholders of corporate offices and of employment by the company. At the same time, the squeezers can protect their own income stream from the business by exorbitant salaries and bonuses to the majority shareholder-officers and perhaps to their relatives, by high rental payments for property the corporation leases from majority shareholders, or by unreasonable payments under contracts between the corporation and majority shareholders." *McCann*, 152 Idaho at 816, 275 P.3d at 831 (quoting F. Hodge O'Neal & Robert B. Thompson, Oppression of Minority Shareholders and LLC Members § 3.2 (Rev. 2nd ed. 2004) (attached in Appendix); *see also* Note, Freezing Out Minority Shareholders, 74 Harv.L.Rev. 1630 (1961)). **Or by firing the minority shareholder from his position as CEO.** *See, e.g., Bonavita v. Corbo,* 300 N.J. Super. 179, 196, 692 A.2d 119, 128 (Ch. Div. 1996) ("When defendants terminated the salary payments made to [Director] Gerald Bonavita, they had an obligation to provide, or at least try to provide, some alternative benefit to the holder of the Bonavita stock. They were not free simply to ignore those interests and operate the corporation for the sole benefit of Alan Corbo.").

Thus, when Defendants argue they "had to fire Mr. Boyle" for cause (Southam Decl. 35), they are not establishing a legal defense; they concede the most important element of a *McCann* squeeze-out. When combined with the other oppressive conduct outlined in Plaintiffs' initial brief and declaration, the likelihood of Plaintiff's success on their claim of minority oppression is clear.

**B.    The Arbitration Clause Does Not Foreclose The Preliminary Relief Plaintiffs Request**.

The defendants seek refuge from Plaintiffs' requested preliminary relief behind the arbitration clause of the sham Asset Purchase Agreement (APA), asking the Court to "deny the

[Plaintiffs'] Motion for improper venue." (Dkt. 47 at 4).  Plaintiffs have never filed such a motion nor sought such relief.  Rather, it is the defendants have moved to *compel* arbitration, while simultaneously asking the Court to dismiss Plaintiffs' the entire Complaint on the merits, with prejudice.  (Dkt. 20-1).

The Ninth Circuit has held that "seeking a decision on the merits of a key issue in a case," including a motion to dismiss under Rule 12(b)(6), "indicates an intentional and strategic decision to take advantage of the judicial forum" which can result in a waiver of the right to compel arbitration of the issue.  *Banq, Inc. v. Purcell*, No. 23-15229, 2024 WL 4164126, at *1 (9th Cir. Sept. 12, 2024) (citation omitted).  The defendants requested dismissal of this case "in its entirety" on the merits in their Rule 12(b)(6) motion to dismiss.  (Dkt. 20-1 at 14–19).  They requested this relief *conjunctively*, not alternatively, thereby "play[ing] heads I win, tails you lose," which constitutes a *waiver* of the right to compel arbitration.  *Hooper v. Advance Am., Cash Advance Centers of Missouri, Inc.*, 589 F.3d 917, 922 (8th Cir. 2009), *abrogated in part on other grounds*, *Morgan v. Sundance, Inc.*, 596 U.S. 411, 142 S.Ct. 1708 (2022) (making it even easier to prove waiver of arbitration clause).

Plaintiffs brought this equivocation to the attention of the defendants and the Court in opposition to the defendants' motion to dismiss and compel discovery, pointing out the inherent inconsistency between simultaneously requesting an order compelling arbitration and an order of dismissal on the merits.   (Dkt. 33 at 10).  The defendants have done nothing to clear up the contradiction.  Instead, they deliberately continue to play "heads I win, tails you lose" on the issue. *Hooper,* 589 F.3d at 922.  This constitutes an "intentional act inconsistent with the right to compel

arbitration" which results in a waiver of that right.  *Banq*, 2024 WL 4164126, at *1 (citation omitted).

Contrary to the defendants' assertions, the Supreme Court has recently "clarified that the pro-arbitration federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Morgan v. Sundance, Inc*.,  142 S. Ct. 1708, 1713 (2022).  Put differently, the pro-arbitration federal policy is simply "to make arbitration agreements as enforceable as other contracts, but not more so."  *Id.* (citation omitted).  "No longer is there a 'special' rule favoring arbitration.*"  Armstrong v. Michaels Stores, Inc*., 59 F.4th 1011, 1014 (9ᵗʰ Cir. 2023).

*Morgan* thereby overruled prior Ninth Circuit precedents in two respects.  "First, *Morgan* teaches that [a]lthough the party opposing arbitration still bears the burden of showing waiver, the burden is no longer 'heavy.'"  *Armstrong ,* 59 F.4th at 1014–15.  "Second, as we recently noted, *Morgan* abrogates our precedents to the extent they required the party opposing arbitration to demonstrate prejudice."  *Id*. at 1015 (citing *Hill v. Xerox Bus. Servs*., 59 F.4th 457, 468-69 (9ᵗʰ Cir. 2023).  In light of the Supreme Court's abrogation of the previous rule strongly favoring arbitration, the defendants' conscious, ongoing decision to resolve the issues in this case in a judicial forum constitutes a waiver of their right to arbitrate.

Even if the Court were to compel arbitration, it cannot dismiss the case but may only stay proceedings and take a "supervisory role" to "assist the parties in arbitration."  (Dkt. 33 at 9) (quoting *Smith v. Spizzirri*, 601 U.S. 472, 478, 144 S. Ct. 1173, 1178 (2024)).  This supervisory role includes the "authority to grant injunctive relief to maintain the status quo pending arbitration," in order to "preserve the meaningfulness of the arbitral process." *Toyo Tire Holdings of Americas Inc. v. Cont'l Tire N. Am., Inc*., 609 F.3d 975, 979–80 (9ᵗʰ Cir. 2010).  Likewise, this Court's authority

to grant Plaintiffs' requested preliminary injunction is essential because the arbitral process would be a hollow formality if the enjoined conduct – the dissipation of company assets stolen by the defendants – is allowed to continue until the defendants' motions are decided and an arbitrator appointed.

**C.      Plaintiffs Have Standing On Their Securities Fraud Claim Under the "Forced Sale" Doctrine**.

The defendantss assert that Plaintiffs Lack Standing because LLC Units are not Securities and No Sale Occurred.  They claim that because Mr. Boyle was a "Manager" under the Operating Agreement, his interest cannot be a security, and because he still physically holds his units no "sale" occurred.    (Defendants' Resp. pp. 18-20).   Their argument depends on a rigid, formalistic interpretation of the Securities Exchange Act roundly rejected by federal law, which looks to the "economic reality" of the relationship.

1.      *Under the* **Howey** *Test, the "Management Board" Rendered the LLC Units "Securities" by Stripping Plaintiff of Control*.

Defendants argue that an LLC interest is not a security. While this assertion is true for active managing members, it is **false** for members who have been structurally rendered passive.  Under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), an arrangement is an investment contract (and thus a security) if it involves: (1) an investment of money, (2) in a common enterprise, (3) with an expectation of profits derived solely from the efforts of others.

The issue at hand focuses upon the third prong – the "efforts of others." "What matters more than the form of an investment scheme is the 'economic reality' that it represents. The question is whether an investor, as a result of the investment agreement itself or the factual circumstances that

surround it, is left unable to exercise meaningful control over his investment." *United States v. Leonard*, 529 F.3d 83, 91 (2nd Cir. 2008). In *Leonard*, the Second Circuit "echo[ed] the Fifth Circuit in finding that investors may be so lacking in requisite expertise, so numerous, or so dispersed that they become utterly dependent on centralized management, counteracting a legal right of control," thereby converting his membership interest into a security. Likewise here, the defendants deliberately engineered a structure that fits the *Howey* and *Leonard* tests like a glove. By creating a "Management Board" that consisted of every director except the Plaintiff, the defendants structurally stripped Mr. Boyle of all meaningful control:

- The Admission: Defendant Southam admitted the purpose was to give Mr. Boyle "less visibility." (Plaintiffs' Supplemental Decl. ¶78, Exhibit 28).

- The Result: From the moment the Management Board was formed, Mr. Boyle became a passive investor dependent entirely on the "efforts of others" (the defendants) to realize any return. His interest, therefore, is a "security" subject to federal protection.

2.  *Defendants' Sham Sale in Dubai Constitutes a "Forced Sale" Because it Fundamentally Altered the Investment.*

The defendants argue that because Mr. Boyle still "owns" his 18% units, he has not "sold" anything and lacks standing (Defendants' Resp. p. 19). This argument ignores the "Forced Seller" doctrine. They assert that Plaintiffs must have "actually purchased or sold a security" to bring a claim. This argument fails to account for the Ninth Circuit's **"Forced Seller Doctrine."** In *Jacobson v. AEG Cap. Corp.* 50 F.3d 1493 (9th Cir. 1995), the Ninth Circuit recognized that " The forced sale doctrine relaxes the requirement that only traditional purchasers or sellers of securities

have standing to bring a Section 10(b) claim (*see, e.g. Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731, 95 S.Ct. 1917, 1923, 44 L.Ed.2d 539 (1975)). A shareholder who is forced to sell or alter her securities as the result of a fraudulent scheme is deemed a seller for purposes of the securities laws." *Id.* at 1499.

The doctrine applies precisely where, as here, a defendant's fraud or oppression renders the plaintiff's ownership completely worthless.  The forced sale doctrine provides a cause of action under the securities laws to plaintiffs who are forced to convert their ownership of a minority yet meaningful ownership stake in a previously profitable and thriving company into the holder of a non-recourse note the payment of which is completely controlled by the Defendants themselves, essentially forced to fundamentally change the nature of plaintiffs' investments as the result of a fraudulent scheme.  By stripping JIFU, LLC of all operating assets and converting the Plaintiffs' membership interest into a claim against a "worthless and illusory note," the Defendants have effectively forced a sale of the Plaintiffs' securities through fraud. The Defendants cannot hide behind the technicality that Plaintiffs still hold "title" to units that the Defendants themselves have rendered worthless.

**D.      Defendants' "Business Judgment Rule" Defense is Frivolous**.

As the Ninth Circuit held in *FDIC v. Castetter*, 184 F.3d 1040 (9th Cir. 1999), the BJR does not protect directors "where there is a conflict of interest, fraud, oppression, or corruption." *Id*. at 1046.  The exception is rooted in the "continuing duty of loyalty," which prohibits a fiduciary from "represent[ing] an interest adverse" to their beneficiary in a substantially related matter.  *Damron v. Herzog*, 67 F.3d 211, 213 (9th Cir. 1995).  The business judgment rule also does not shield a

director who has "wholly abdicated his corporate responsibility." *Castette*r, 184 F.3d at 1046. A director abdicates his corporate responsibility by "closing his or her eyes to corporate affairs," *id*. at 1046, or "passively rubber-stamping the acts of the active corporate managers." *In re Comverse Tech., Inc.,* 56 A.D.3d 49, 56, 866 N.Y.S.2d 10, 17 (2008). *See also Edelman v. Fruehauf Corp*., 798 F.2d 882, 885-86 (6th Cir. 1986) (board committee's mere "rubber stamp" of proposal submitted by management rebuts business judgment rule).

Defendants' conduct fails on all counts to invoke the business judgment rule. The pretextual APA (Dkt. 1,  81, Ex. 20), which transfers all assets to an insider-controlled entity with no compensation to Boyle, is a paradigmatic example of a self-dealing transaction and a breach of the fiduciary duty of loyalty established above. Furthermore, the defendants' sham 15-minute meeting (Dkt. 1,  78) proves the directors did not deliberate but rather "closed their eyes" the reality of the transaction and rubber-stamped the sham sale, thereby abdicating their fiduciary duties. The defendants' fabricated minutes (Plaintiffs' Supplemental Decl. ¶138.) and the patently oppressive terms of the APA (Dkt. 1, Exhs. 20 and 21) are dispositive proof of the defendants' bad faith.

**E.     Dissolution is NOT an Exclusive Remedy.**

The defendants claim that the exclusive remedy for their minority oppression is a dissolution and unwinding. Again, they are mistaken. It is well established that an oppressed minority shareholder's stock should be valued as *pro rata* share of closely held corporation's going concern using rule of thumb formula, without consideration of any minority or marketability discounts that might have been applicable in other circumstances. *See, e.g., Hayes v. Olmsted & Assocs., Inc*., 173 Or. App. 259, 21 P.3d 178 (2001). *See also Brynwood Co. v. Schweisberger,* 393 Ill. App. 3d 339, 353, 913 N.E.2d 150, 162 (2009) ("While no Illinois court has so held, other jurisdictions agree that

dissenters' rights statutes that employ the term "fair value" require the trial court to value the dissenting shares by looking at what they represent—a percentage ownership in the intrinsic value of the corporation as a going concern.") (many citations omitted); *Brown v. Arp & Hammond Hardware Co.*, 141 P.3d 673, 687 (Wyo. 2006) ("We join the majority of courts in holding, as a matter of law, that a minority discount may not be applied in determining the fair value of a dissenting shareholder's interest.")

Finally, the "sale" of JIFU itself was a sham designed to circumvent securities laws. The defendants claim in their Response that the assets were sold to an independent third party, Unity Global (Defendants' Resp. p. 8; Southam Decl. 40). Plaintiffs' Supplemental Declaration Exhibit 40 (The Dubai DMCC Registry) proves that Defendant Kyle Copeland – a party to the Seller – is the "License Manager" (Statutory Manager) of the Buyer. This circular transaction confirms that the "liquidation" was merely a fraudulent transfer of value from the Plaintiffs to the defendants, cementing the status of the transaction as a *forced sale* under Rule 10b-5.

## II.  ALTERNATIVE SERVICE IS NECESSARY UNDER FRCP 4(f)(3).

The defendants have failed to oppose Plaintiffs' request for alternative service on Defendant Danien Feier and his Entities, Seven Holding Limited, and Unity Global DMCC, UAE foreign entities. The motion therefore should be granted.

### CONCLUSION

Based on the foregoing, Plaintiffs request that their motion be granted.

DATED this 13th day of January, 2026.

WOOD LAW GROUP, PC

By: /s/ _____
     T. Jason Wood, Esq.

14 -    REPLY IN SUPPORT MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (RULE 65), FOR ALTERNATIVE SERVICE (RULE 4(f)(3)), AND FOR OTHER RELIEF

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 13, 2026, I filed the foregoing electronically through the CM/ECF system, which caused all registered participants to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

WOOD LAW GROUP, PC

By: /s/ _____
T. Jason Wood, Esq.

1 Oppression of Min. Shareholders and LLC Members § 4:9

**O'Neal and Thompson's Oppression of Minority Shareholders and LLC Members** | November 2025 Update
The late F. Hodge O'Neal, Robert B. Thompson, and Douglas K. Moll

**Chapter 4. Squeeze-Out Techniques: Sale of Control and Related Techniques**

## § 4:9. Looting cases

One area where courts have been willing to impose liability in sale of control cases is when the purchaser uses the newly acquired control to loot the corporation of assets. A director or officer, as a general proposition, is permitted to resign those positions at any time,[1] but there are occasions when directors or officers cannot quit with impunity. It is established that "[they] cannot terminate their agency or accept the resignation of others if the immediate consequences would be to leave the interests of the company without proper care and protection."[2] Controlling shareholders, even if they are not directors or officers, are obligated whenever they transfer corporate control, to take reasonable measures to protect the corporation, its creditors and shareholders against fraud and misappropriation by the transferee.

Obviously, sellers of a controlling interest in a corporation are subject to liability if they become parties to a conspiracy to loot the corporation, or if they heedlessly resign their office or cause their nominees to resign and thereby turn control of the corporation over to persons they *know* intend to loot the corporation's treasury.[3] Furthermore, they become liable to the corporation if they *negligently* turn control over to irresponsible purchasers who proceed to loot the corporation or its subsidiaries.[4] Such discussion invites comparison to typical tort liability apart from corporate law. A Delaware court noted the general duty each person owes "to those who may be harmed by her action to take such steps as a reasonably prudent person would take in similar circumstances to avoid such harm to others. … I can find no universal privilege from the corporate form that exempts a controlling shareholder who sells corporate control from the wholesome reach of this common law duty."[5]

As illustrated by this tort analogy, the looting cases differ from other control premium cases in their strong emphasis on the duty of care as opposed to the duty of loyalty.[6] This difference is also reflected in the remedy in that defendants are held liable for damages sustained by the other shareholders even if the defendants did not benefit directly.[7] Indeed in some looting cases, the selling shareholders also appear to be victims of the looters.[8]

A corporation with liquid assets, such as an investment company or other financial enterprise, is particularly attractive to a looter and several of the leading looting cases have arisen in that context. In *Insuranshares Corp. of Delaware v. Northern Fiscal Corp.*[9] controlling shareholders of an investment company sold their 27% interest to a syndicate. The incumbent directors successively resigned, and immediately after each resignation the remaining directors filled the vacancy with a nominee designated by the syndicate. Soon after acquiring control, the syndicate systemically looted the corporate assets by substituting worthless securities for valuable ones. The court held the selling shareholders, including shareholders who had not been directors or officers, were liable to the corporation for losses it sustained from the looting. Selling shareholders, said the court, have a duty not to deliver control of a corporation under circumstances that would arouse the suspicion of prudent men that the transferees intend to loot the corporation, until the seller has made an adequate investigation which reasonably establishes that no fraud is intended or is likely to result.[10]

Among the circumstances which the court felt should have aroused the sellers' suspicion and caused them to investigate were the high price paid for the shares, arrangements indicating that the purchase might be financed out of the corporation's assets,

Case 1:25-cv-00526-AKB    Document 52    Filed 01/14/26    Page 17 of 26

and the purchaser's insistence upon an immediate transfer of control that could give it access to the corporation's readily saleable securities. Although the selling shareholders in the *Insuranshares* case had received a price for their shares in excess of their market value, plaintiff apparently did not ask that they be compelled to disgorge a part of that premium and no part of the premium in fact appeared as an element of plaintiff's recovery.

In a New York case, *Gerdes v. Reynolds*,[11] also involving an investment company and facts similar to those in *Insuranshares*, the court not only required the sellers to respond in damages to the corporation's trustee for losses suffered by the corporation as a consequence of the sellers' turning over control to irresponsible buyers, but also compelled them to account to the trustee for the part of the purchase price that had been paid for turning over immediate control of the corporation by resigning and electing successors. Apparently the court did not require the sellers to account for the normal increment to the value of the shares resulting from the fact that they constituted a control block. In its opinion the court vacillated between two theories of liability—negligence of the sellers in turning control over to looters, and breach of fiduciary duty in receiving an excessive price for their shares which was in considerable part a payment for their resignations as officers and directors and their election of the purchasers' nominees.

There is a question whether the court in either the *Insuranshares* or *Gerdes* case would have imposed liability on defendants for the amount of their premium if sale of control had not been followed by looting and if there had been no reason for anticipating looting. However, in a later New York case,[12] sellers who had resigned their offices and directorships in favor of the purchasers' nominees were required to account for the premium they received where the sale was to persons known to be irresponsible and looting might reasonably have been anticipated even though no looting actually occurred. The sellers knew that the principal buyers, who at one time had been directors of the corporation, had previously looted it.

Investment companies (e.g. mutual funds) are, of course, peculiarly subject to looting, as their assets are largely in the form of readily marketable securities.[13] Federal law enacted later in the year of the *Insuranshares* decision imposed requirements making looting more difficult in this setting. The Investment Company Act of 1940 protects against seriatim resignations and replacements of directors of investment companies and thereby decreases the likelihood of looting by providing that a vacancy on the board of directors cannot be filled except by vote of shareholders unless immediately after the filling of such a vacancy at least two-thirds of the directors have been elected by the shareholders.[14] Subsequent federal legislation further regulates sale of control of the investment adviser advising the mutual fund, the common organizational pattern for these companies. After a federal court held that a fund could recover the profits realized by a former investment adviser from the transfer of its business,[15] Congress permitted such sales subject to specified safeguards.[16]

A 2003 federal court decision finding a viable cause of action under state law for negligent sale of an insurance company to looters concluded, "Since Insuranshares was decided in 1940, courts have widely accepted its duty of care for controlling transferors," recognizing that doctrine as the majority view on the subject.[17] Further, the federal court noted that later decisions have accepted the Insuranshares conception of the duty as "requiring a pre-sale investigation when the circumstances surrounding a proposed sale are sufficiently suspicions as to put a prudent person on his or her guard." This holding rejected an actual knowledge requirement of another early New York case, *Levy v. American Beverage Corp.*,[18] where a corporation's president sold 53% of the corporation's stock for more than three times its market value. After the corporation suffered financial losses, minority shareholders sued the sellers on the ground that they had sold controlling stock to purchasers whom they knew or should have known were financially irresponsible and intended to loot the corporation. The court commented:

> To apply the rigid rules limiting a fiduciary, and to say further that the failure to investigate the moral character, or financial ability, of the purchaser of one's stock is an actionable wrong, is to place an unwarranted burden upon the ownership of stock. … . The law does not require one to act on the assumption that a person with whom a business transaction, even of a large amount, is had, will commit a fraudulent or criminal act if given the opportunity to do so.[19]

The circumstances which impose a duty upon a selling shareholder to investigate the possibility that a prospective purchaser might loot the corporation can vary with the specific context. A Delaware court held that "at the very least … a claim must plead facts that indicate that the controller knew that there was a risk that the buyer was a looter or otherwise intended to extract illegal rents from the subsidiary at the expense of the remaining shareholders."[20] A federal district court identified seven factors that were more than sufficient to arouse the seller's suspicions in the sale of a controlling share of a candy company which had a considerable part of its assets in cash, including the purchaser's lack of experience in the candy business that was being bought, the seller's failure to inspect the candy company operations, the dispatch with which the sale was conducted, and the purchaser's inquiry as to the availability of candy company funds for the payment of the purchase price.[21]

The court of appeals reversed, however, in the context of a claim brought by debenture holders against the parent company that had owned all of the stock in the candy company prior to the sale. It concluded that the seven factors alone or in concert were insufficient to suggest to the seller that the buyer intended to loot the candy company, especially as there were many "positive indications" that the purchaser intended to operate the company and to operate it profitably. Concerning factor seven, the Fourth Circuit panel commented:

> The inquiries made by Atlantic [the purchaser] with regard to the availability of Meadors' [the candy company's] funds for payment of the purchase price were not such as to provide a basis on which Keebler [the seller] could suspect how payment would be made, especially since Keebler made its position clear that Atlantic must consummate the purchase with its own funds. It is true that the record shows that Atlantic did not do so, but the record does not disclose an evidentiary basis to find, nor did the district court find, that Keebler knew or had reason to know of Atlantic's one-day loan and its immediate repayment with Meadors' funds. Whatever inkling Keebler may have had that Atlantic was interested in using Meadors' cash did not rise to a level sufficient to necessitate further investigation, especially in light of Atlantic's seemingly strong financial position and its apparent ability to finance the transaction with its own monies.[22]

A subsequent Fourth Circuit opinion on a seller's duty to investigate, focused particularly on the importance of a large premium on facts where the majority shareholders sold shares of a racetrack corporation for $34.75 when the shares had been trading previously for $7.50-$10 per share.[23] The court said,

> the premium price paid to Hutchison cannot be said to be so unreasonable as to place him on notice of the likelihood of fraud on the corporation or the remaining shareholders …. … . As a matter of logic, it seems farfetched to pay a 400 percent premium for stock simply in order to acquire control of a corporation in order to loot it. Certainly a cheaper corporate enterprise could be acquired for such malevolent purposes.[24]

A dissenting judge, in a strong opinion, argued that sellers should be alert to the likelihood that a purchaser willing to pay a huge premium might convert assets to his own use. Moreover, the judge believed that the seller's insistence on the purchaser acquiring the stock of certain favored minority shareholders justified the inference that the seller foresaw the likelihood of corporate disaster.[25]

In contrast to these Fourth Circuit cases, a federal district court in Rhode Island denied defendant's motion for summary judgment where the plaintiff planned to produce evidence of the seller's prior awareness' of the purchaser's lacking adequate independent financing, its conspiring to hide this fact from regulators and knowledge of the purchaser reputation for past fraud.[26]

Westlaw. © 2025 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

1      "Directors may resign at any time and for any reason if they act in good faith and without personal gain."
       Rowen v. Le Mars Mut. Ins. Co. of Iowa, 282 N.W.2d 639, 659 (Iowa 1979).

2      Morawetz, Corporations, § 563 quoted in Zeltner v. Henry Zeltner Brewing Co., 174 N.Y. 247, 253, 66
       N.E. 810, 812 (1903). "Neither can they accept pay in any form or guise, direct or devious, for their own
       resignation or for the election of others in their place." Gerdes v. Reynolds, 28 N.Y.S.2d 622, 651 (Sup 1941).

3      Bosworth v. Allen, 168 N.Y. 157, 61 N.E. 163 (1901) (directors and officers who for a bonus conspired
       with outsiders, known to be irresponsible, to give them control by resigning in succession held liable to
       corporation's receiver for restitution and damages). If officers, directors or shareholders actually know that
       the purchaser of control intends to loot the corporation, their liability "would not have to be predicated upon
       breach of a fiduciary relation, for the act [of turning over control under those circumstances] would amount
       to a wilful and malicious injury to property, tortious in its very nature." Gerdes v. Reynolds, 28 N.Y.S.2d
       622, 652 (Sup 1941). "The duty seems to me to resemble the obligation which everyone is under not to
       assist another to commit a tort rather than the obligation of a fiduciary." Swann, J., dissenting in Perlman v.
       Feldmann, 219 F.2d 173, 179, 50 A.L.R.2d 1134 (2d Cir. 1955).

4      Insuranshares Corp. of Delaware v. Northern Fiscal Corp., 35 F. Supp. 22 (E.D. Pa. 1940); Insuranshares
       Corp. of Delaware v. Northern Fiscal Corp., 42 F. Supp. 126 (E.D. Pa. 1941) (ascertainment of damages);
       Gerdes v. Reynolds, 28 N.Y.S.2d 622 (Sup 1941); Ballantine v. Ferretti, 28 N.Y.S.2d 668 (Sup 1941).

       See also DeBaun v. First Western Bank & Trust Co., 46 Cal. App. 3d 686, 120 Cal. Rptr. 354, 77 A.L.R.3d
       991 (2d Dist. 1975) (majority shareholder in a corporation owes a duty of reasonable investigation and due
       care to the corporation in selling his shares when he has facts establishing a reasonable likelihood that the
       purchaser intends to loot the corporation of its assets. The facts were as follows: while negotiating with the
       purchaser the selling shareholder (a bank) became aware from a credit report that the purchaser was notable
       for the failure of entities he controlled; an officer of the seller knew that the purchaser had perpetrated a fraud
       on the seller's predecessor bank and had not satisfied a judgment the bank held against him; the purchaser's
       attorney refused to give an opinion on litigation in which the purchaser and entities controlled by him were
       involved; an investigation of public records would have revealed the purchaser's past financial failures;
       the seller, knowing the shares being sold could not be paid for from corporate income, obtained corporate
       approval of an agreement hypothecating the corporation's assets to secure the purchaser's obligation).

       For additional discussion of the controlling shareholder's duty to investigate before turning over control, see
       Annot., Controlling stockholder's duty to investigate intent and motive of purchaser before selling stock,
       77 A.L.R.3d 1005.

5      Harris v. Carter, 582 A.2d 222 (Del. Ch. 1990), in which a Delaware court, relying on common-law tort
       principles, adopted the rule which imposes a duty to refrain from selling control when a reasonably prudent
       person under the circumstances would be alerted to a risk that the purchaser is somehow untrustworthy.

6      KDT Industries, Inc. v. Home Ins. Co., 603 F. Supp. 861 (D. Mass. 1985) (majority shareholders, as
       fiduciaries, may not transfer control of corporation under circumstances in which it would be reasonable to
       assume that buyer will harm corporation or its shareholders by raiding corporate treasury, committing fraud,
       or implementing harmful business policies).

7      See Bosworth v. Allen, 168 N.Y. 157, 61 N.E. 163 (1901) (directors and officers who for a bonus conspired
       with outsiders, known to be irresponsible, to give them control by resigning in succession held liable to
       corporation's receiver for restitution and damages). If officers, directors or shareholders actually know that
       the purchaser of control intends to loot the corporation, their liability "would not have to be predicated upon
       breach of a fiduciary relation, for the act [of turning over control under those circumstances] would amount

to a wilful and malicious injury to property, tortious in its very nature." Gerdes v. Reynolds, 28 N.Y.S.2d 622, 652 (Sup 1941). "The duty seems to me to resemble the obligation which everyone is under not to assist another to commit a tort rather than the obligation of a fiduciary." Swann, J., dissenting in Perlman v. Feldmann, 219 F.2d 173, 179, 50 A.L.R.2d 1134 (2d Cir. 1955).

8    See, e.g., DeBaun v. First Western Bank & Trust Co., 46 Cal. App. 3d 686, 120 Cal. Rptr. 354, 77 A.L.R.3d 991 (2d Dist. 1975); Harris v. Carter, 582 A.2d 222 (Del. Ch. 1990).

9    Insuranshares Corp. of Delaware v. Northern Fiscal Corp., 35 F. Supp. 22 (E.D. Pa. 1940).

10    Insuranshares Corp. of Delaware v. Northern Fiscal Corp., 35 F. Supp. 22, 25 (E.D. Pa. 1940).

11    Gerdes v. Reynolds, 28 N.Y.S.2d 622 (Sup 1941).

12    Benson v. Braun, 141 N.Y.S.2d 286 (Sup 1955), order aff'd, 286 A.D. 1098, 145 N.Y.S.2d 711 (2d Dep't 1955).

13

> The immediate consequence of the resignation of the entire body of officers and directors of a corporation obviously is at least potentially different where the corporation's assets are land and buildings and where they are securities which to all intents and purposes are practically negotiable, and such potential difference must be taken into account, both by the officers and directors and by a court judging their conduct, in considering whether their en masse resignations would leave the assets without proper care and protection … .

Gerdes v. Reynolds, 28 N.Y.S.2d 622, 653 (Sup 1941).

In Harman v. Willbern, 520 F.2d 1333 (10th Cir. 1975), involving sale of control of an investment company, the court recognized that the right of a majority shareholder to dispose of his shares at any time for any price is a limited right and that he may not do so "if the circumstances surrounding the proposed transfer would alert suspicion in a prudent man that the purchasers are an irresponsible group who will mismanage and loot the corporate assets," but it affirmed the trial court's finding that the selling shareholder had not breached a fiduciary duty. The selling shareholder had checked the purchaser's general business reputation with several bankers, the price he had obtained for his shares was not inflated, and he was not aware of the purchaser's financial insecurity.

14    Investment Company Act of 1940, 15 U.S.C.A. § 80a-16(a). See also Jaretski, The Investment Company Act of 1940, 26 Wash. U. L.Q. 303, 323–324 (1941).

15    See, Rosenfeld v. Black, 445 F.2d 1337 (2d Cir. 1971). Compare Securities and Exchange Commission v. Insurance Securities, Inc., 254 F.2d 642 (9th Cir. 1958).

See also Nizin v. Bright, 478 F. Supp. 713 (D. Mass. 1979), aff'd, 618 F.2d 93 (1st Cir. 1980) (Investment Company Act of 1940 does not prohibit the sale of control by a mutual fund's investment advisor because the Act provides for automatic termination unless the mutual fund shareholders give their approval for the advisor to retain his position.).

16    See Section 15(f) of the 1940 Act, 15 U.S.C. § 80a-15(f) permitting profit if 75% for the adviser's directors are independent for three years after the transaction and the transaction does not lead to an "unfair burden" defined to include the adviser receiving compensation for other than bona fide investment advisory or other services during the following two years. See also, Meyer v. Oppenheimer Management Corp., 895 F.2d 861, 865–66 (2d Cir. 1990) (rejecting plaintiff's contention that a sale of the investment advisor imposed an unfair burden on the fund in violation of 15(f)).

17    McConaghy v. Sequa Corp., 294 F. Supp. 2d 151, 162 (D.R.I. 2003) (also noting treatises adopting the Insuranshares standard).

18    Levy v. American Beverage Corp., 265 A.D. 208, 38 N.Y.S.2d 517 (1st Dep't 1942) (Transfer of control was accomplished without the necessity of director resignations, as the sale, which was kept secret, was made shortly before the annual meeting. The sellers by simply giving the purchaser proxies to vote the shares being transferred enabled the purchaser to elect new directors.).

Cases rejecting the actual knowledge standard include See Northway, Inc. v. TSC Industries, Inc., 512 F.2d 324, 342 (7th Cir. 1975), judgment rev'd on other grounds, 426 U.S. 438, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976); Hooper's Estate v. Government of Virgin Islands, 7 V.I. 511, 427 F.2d 45 (3d Cir. 1970). See also Harris v. Carter, 582 A.2d 222 (Del. Ch. 1990) (the principle of Insuranshares, not the actual notice rule of Levy has commanded the respect of later courts); Swinney v. Keebler Co., 480 F.2d 573, 577 (4th Cir. 1973) (the district court properly rejected the actual notice test of Levy). See generally, Elhauge, The Triggering Function of Sale of Control Doctrine, 59 U. Chi. L. Rev. 1465, 1468 (1992).

19    Levy v. American Beverage Corp., 265 A.D. 208, 218, 38 N.Y.S.2d 517, 526 (1st Dep't 1942).

See also Harman v. Willbern, 520 F.2d 1333 (10th Cir. 1975) (director did not breach fiduciary duty to corporation in selling control to persons who later looted the corporation, when there were no circumstances at the time of sale which would have put a prudent man on notice that the purchaser's intentions were anything but honorable).

See, generally, Hazen, Transfer of Corporate Control and Duties of Controlling Shareholders, 125 U. Pa. L. Rev. 1023, 1030–1033 (1977).

20    Abraham v. Emerson Radio Corp., 901 A.2d 751, 762 (Del. Ch. 2006) (even assuming that controller can be liable for mere carelessness, finding no such showing by the plaintiff where the purchaser was a strategic buyer).

21    Swinney v. Keebler Co., 329 F. Supp. 216, 224 (D.S.C. 1971), judgment rev'd, 480 F.2d 573 (4th Cir. 1973).

22    Swinney v. Keebler Co., 480 F.2d 573, 578 (4th Cir. 1973).

23    Clagett v. Hutchison, 583 F.2d 1259 (4th Cir. 1978).

24    Clagett v. Hutchison, 583 F.2d 1259 (4th Cir. 1978).

25    Clagett v. Hutchison, 583 F.2d 1259 (4th Cir. 1978). Further, the dissenting judge accepted the proposition that the corporation and its managers should treat equally all holders of the same class of stock and that therefore the selling shareholder, being in control of the corporation, violated a fiduciary duty in using his leverage to favor one group of minority shareholders over another. Finally, the dissenting judge pointed out that one of the corporation's most valuable assets was its license to conduct harness races and the State of Maryland places great importance upon the integrity and competency of persons controlling a licensee, a seller of a controlling block of shares should investigate a purchaser to make certain that the license will not be placed in jeopardy by a dishonest or incompetent purchaser acquiring control.

26    McConaghy v. Sequa Corp., 294 F. Supp. 2d 151 (D.R.I. 2003).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

§ 5:33. Appraisal rights; Limitations on the effectiveness of..., 1 Oppression of Min....

Case 1:25-cv-00526-AKB    Document 52    Filed 01/14/26    Page 22 of 26

1 Oppression of Min. Shareholders and LLC Members § 5:33

**O'Neal and Thompson's Oppression of Minority Shareholders and LLC Members** | November 2025 Update
The late F. Hodge O'Neal, Robert B. Thompson, and Douglas K. Moll

**Chapter 5. Squeeze-out Techniques: Fundamental Corporate Changes**

**F. Remedies for Minority Shareholders Against Fundamental Corporate Change**

---

## § 5:33. Appraisal rights; Limitations on the effectiveness of dissenters' statutory right to have shares purchased

Statutes referred to as "appraisal statutes" or "dissenters' rights statutes" supposedly mitigate somewhat the risk of hardship or injustice to minority shareholders from mergers and other fundamental corporate changes. These statutes authorize a shareholder who dissents from such a transaction to demand that the corporation purchase his or her shares at their fair value. If the shareholder and the corporation cannot agree on a price, the statutes provide for a judicially determined appraisal of the shares to determine the purchase price.[1] All jurisdictions confer such rights upon dissenters whenever a corporation merges or consolidates, and all but a few jurisdictions also confer them whenever a corporation sells all or substantially all corporate assets.[2] Many states also provide for payment to dissenters after some charter amendment, e.g., reverse stock splits.[3] Option holders are not usually included in statutes granting appraisal rights and option holders have been rebuffed in seeking dissenter's rights.[4]

Dissenters' rights statutes originally sought to protect non-assenting shareholders against being forced to accept membership in an enterprise fundamentally different from the one in which they originally invested or forced to participate on a basis drastically different from the one they contemplated when they invested. When legislatures abrogated the old common-law rule requiring unanimous shareholder consent for a fundamental corporate change and gave majority shareholders broad powers to amend a corporation's charter, merge or consolidate the corporation with other companies, sell all of its assets, or alter its financial structure and the characteristics of its outstanding stock, they enacted appraisal statutes to give a dissenting shareholder an option in at least some of these situations to withdraw from the enterprise and receive fair value for the shares.[5] One commentator described the considerations leading to the enactment of the early appraisal statute as follows:

> [I]t was also realized that it was necessary to afford some relief to dissenters; that, though a small group should not be able to prevent the majority from doing with the corporation what they thought wise, yet the minority should not be forced to continue in an enterprise radically different from the venture on which they originally embarked, or in an essentially altered status. The result in most jurisdictions was a compromise conferring on the dissenters the right to receive the cash value of their stock and providing for an appraisal where no agreement could be reached.[6]

As merger statutes evolved to permit majority shareholders to cash out the minority in many situations, appraisal statutes came to serve another purpose, that of creating a judicial check on the price and terms at which the majority could force out the minority.[7] But appraisal statutes as traditionally written and interpreted are not adequate to serve this broader purpose. For example, one commentary argues:

> Appraisal is predicated more on the conception of managerial incompetence in valuing an old enterprise and negotiating a price for it than on the notion of a conflict of interest which results in a diversion of a portion of

§ 5:33. Appraisal rights; Limitations on the effectiveness of..., 1 Oppression of Min....

Case 1:25-cv-00526-AKB    Document 52    Filed 01/14/26    Page 23 of 26

the merger proceeds to a controlling parent … it neither serves nor is designed to serve as a remedy for fiduciary misbehavior at which a fairness challenge is directed.[8]

Another commentary advances a somewhat different purpose: since managers have strong incentives to maximize the value of the company, shareholders are better off delegating decisions to management and not even incurring appraisal costs; appraisal statutes protect the minority in those situations "where coordination or conflict of interest make it likely that value-increasing strategy will not be followed."[9]

A court's view of the purpose of the appraisal process may determine the remedy it provides and particularly whether it decides that the appraisal statute provides an exclusive remedy for minority shareholders who complain of an unfair merger transaction. If a court views the appraisal statute as designed to remedy the parent corporation's conflict of interest in pushing through a short form merger with a subsidiary, it will be unlikely to provide a remedy outside of the appraisal procedure. If, on the other hand, a court views appraisal statutes as designed only to remedy illiquidity or incompetence, but not conflict of interest, or if it concludes that the statutes, as applied, are incapable of protecting minority shareholders against abuses growing out of majority shareholders' conflicts of interest, then it is likely to offer minority shareholders additional protection beyond the appraisal statute.[10]

The method of determining value under appraisal statutes and procedural requirements governing the use of the appraisal right obviously have a dramatic effect on the effectiveness of the remedy and are discussed in more detail in the following sections. If appraisal procedures produce a gross undervaluation as compared to real world values, this result diminishes the usefulness of the remedy and opens up the possibility of manipulation by "those in control to freeze out the minority at unfairly low prices."[11]

The sections which follow address specific aspects of the appraisal remedy. In reading these sections, remember that appraisal is used in two distinct transactional contexts which correspond to the historical shift in the remedy discussed above. In these two settings, the risks to minority shareholders come from opposite directions: In one setting the majority shareholder seeks to avoid the minority having appraisal rights and in the other the majority shareholder seeks to insist on appraisal rights as the minority's exclusive redress. First, the majority shareholder may seek to avoid the minority's statutory right to dissent. As has been illustrated elsewhere in this chapter, several different techniques usually will be available to achieve a corporate change desired by the majority, and not all of these methods trigger dissenters' rights.[12] Consequently, directors or majority shareholders often can fundamentally change shareholders' participation in the enterprise without giving them the opportunity to have their shares appraised and purchased.

In other contexts the harm to the minority shareholders may come from a different direction. The transaction may be structured in a way that provides dissenters' rights but the complex procedures in the statutory process, the expense the minority shareholders must incur, and the possibility that a low value will result from the statutory formula may leave minority shareholders without a practical means for obtaining fair value for the shares they are being forced to give up in a merger or other fundamental corporate change.

Appraisal continues to be used in contexts where shareholders have approved an arm's length merger by the requisite statutory majority vote where shares are widely dispersed ion the market place. Not surprisingly in that setting, where the risk of self-dealing is less, courts look more to the negotiated price to determine appraisal value.[13]

Appraisal serves a distinct purpose in each of the two contexts. In the first it provides an exit to minority shareholders who do not desire to continue in a changed enterprise. The remedy provides liquidity from the corporation as a substitute for the shareholder having to find whatever liquidity is available in the market. In the second, appraisal provides a judicial check on terms imposed by the majority to force the minority out of the enterprise. The procedures and valuation principles incorporated in appraisal for

the most part still reflect the initial setting, when the law desired to provide the minority an exit, but on terms more concerned with the minority's hold-up of a beneficial corporate transaction. Over time, the law has pulled back the protection available to minority shareholders in the first setting, recognizing that shareholders in publicly held corporations have markets that can provide liquidity. In addition, the retreat in vested rights theory means the law expects shareholders to submit to majority rule on most business decisions that are unaffected by self-interest.

This hostility toward the traditional application of appraisal and a narrow interpretation in its use has sometimes carried over to interpretations in the second and more modern context where these policies should not apply. When the minority is denied a choice to continue in the merged enterprise, there is no longer a worry about the minority taking scarce cash from the corporate treasury and thereby derailing a beneficial third party merger. Instead the majority shareholder is using a fundamental change to force the minority out of the enterprise. Appraisal thus has to serve as a check on conflict of interest, which it did not do in its initial incarnation. Courts and legislatures should be careful that when they transfer this venerable remedy into this new setting, they send with it procedures and valuation principles that reflect the cash-out context, not the traditional context when the minority was choosing to exit a changed enterprise. Appraisal as established in its traditional setting is not sufficient to be an exclusive remedy and courts likely will continue to permit alternative remedies to insure that there is a check on self-dealing by majority shareholders.

Appraisal statutes contain a list of transactions that trigger a dissenter's right to seek judicial valuation and usually contain various exceptions. One confusing exception, particularly relevant to cash-out mergers, relates to the use of cash. For example, Delaware's statute 262(b) describes those transactions giving rise to appraisal in broad terms covering shares in constituent corporations to mergers.[14] Subsection (1) of that section then provides two separate but not separately numbered exceptions: a "market out" exception for transactions in which shareholders have publicly traded shares and another one for the surviving entity's shareholders if a shareholder vote is not required (i.e. not issuing shares greater than 20% of the outstanding number).[15] Subsection (2) of that section provides an exception to the exception(s) that restores appraisal rights when the consideration specified in the merger is anything other than shares of stock of the surviving corporation or similar consideration.[16] The result of this triple reverse is that a cashed out shareholder gets appraisal rights, even in publicly-traded companies in arm's length transactions.[17] The Model Business Corporation Act is more direct in providing appraisal rights to squeeze-out transactions in which management has a conflicting interest.[18]

Westlaw. © 2025 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

1    See generally, Lattin, Minority and Dissenting Shareholders' Rights in Fundamental Changes, 23 Law & Contemp. Probs. 307 (1958); Levy, Rights of Dissenting Shareholders to Appraisal and Payment, 15 Cornell L.Q. 420 (1930); Lattin, Remedies of Dissenting Stockholders Under Appraisal Statutes, 45 Harv L Rev 233 (1931); Manning, The Shareholder's Appraisal Remedy: An Essay for Frank Coker, 72 Yale L.J. 223 (1962); Eisenberg, The Structure of the Corporation § 7.3 (1976); Weiner, Payment of Dissenting Stockholders, 27 Colum. L. Rev. 547 (1927); Note, The Rights of Shareholders Dissenting From Corporate Combinations to Demand Cash Payment for Their Shares, 72 Harv. L. Rev. 1132 (1959); Buxbaum, The Dissenter's Appraisal Remedy, 23 U.C.L.A. L. Rev. 1229 (1976); Kanda and Levmore, The Appraisal Remedy and the Goals of Corporate Law, 32 U.C.L.A. L. Rev. 429 (1985).

For a discussion of corporate actions giving rise to appraisal rights in Canada, see MacIntosh, The Shareholders' Appraisal Right in Canada: A Critical Reappraisal, 13 Can-US L.J. 299 (1988).

There is some authority for the proposition that even in the absence of statute, dissenting shareholders have the right to demand payment for their shares whenever majority shareholders effect a fundamental change in the corporation. Barnett v. Philadelphia Market Co., 218 Pa. 649, 67 A. 912 (1907); Lauman v. Lebanon

§ 5:33. Appraisal rights; Limitations on the effectiveness of..., 1 Oppression of Min...

Case 1:25-cv-00526-AKB    Document 52    Filed 01/14/26    Page 25 of 26

Valley R. Co., 30 Pa. 42, 1858 WL 7710 (1858); International & G.N.R. Co. v. Bremond, 53 Tex. 96, 1880 WL 9286 (1880).

2  See Model Bus. Corp. Act Ann. § 13.02(a)(3).

3  Model Bus. Corp. Act Ann. § 13.02(a)(4). In 1977 the Model Business Corporation Act was amended to extend dissenters' rights to charter amendments which adversely affect shareholders' rights involving voting, preemptive rights or preferred dividend rights. Those changes also eliminated dissenters' rights of shareholders of an acquiring company whose shares increase by no more than 20% because of the fundamental corporate change. See Report of the Committee on Corporate Laws, Changes in the Model Business Corporation Act Affecting Dissenters Rights, 32 Bus. Law 1855 (1977). Subsequent amendments shifted to a more specific focus on reverse stock splits.

4  Aspen Advisors LLC v. United Artists Theatre Co., 861 A.2d 1251 (Del. 2004) (appraisal rights not available to warrant holder unless and until the warrant is converted); Andaloro v. PFPC Worldwide, Inc., 830 A.2d 1232 (Del. Ch. 2003).

5  See § 5:3.

6  Levy, Rights of Dissenting Shareholders to Appraisal and Payment, 15 Cornell L.Q. 420, 421 (1930).

See also Chicago Corp. v. Munds, 20 Del. Ch. 142, 149, 172 A. 452, 455 (1934).

In short, at least in the context of the privately held corporation, the appraisal right is a mechanism admirably suited to reconcile the need to give the majority members of a normally perpetual organization the right to make drastic changes in the enterprise to meet new conditions as they arise with the need in such an organization to prevent the minority from being involuntarily dragged along into a drastically changed enterprise in which it has no confidence.

Eisenberg, The Legal Roles of Shareholders and Management in Modern Corporate Decisionmaking, 57 Calif. L. Rev. 1, 80 (1969).

Compare the following comment from Manning, The Shareholder's Appraisal Remedy: An Essay for Frank Coker, 72 Yale L.J. 223, 246-247 (1962): "When commercial pressures forced the enactment of the general merger statutes, the function of the appraisal statutes was clear. They met a conceptual and ideological problem—how to preserve the constitutionality of the merger statutes. The appraisal provisions were calculated to solve a purely conceptual need—to provide something for the shareholder who was about to undergo a legal trauma—a trauma deemed compensable regardless of its economic consequences upon him."

7  See Fischel, The Appraisal Remedy in Corporate Law, 1983 A.B.F. Res. J. 875, 876 ("appraisal best understood as an implied contractual term that sets the minimum price at which the firm or a part thereof, can be sold in situations where certain groups are more likely to attempt to appropriate wealth from other groups than to maximize the wealth of the firm").

Part of this change involving the purpose of appraisal resulted from the fact that squeeze-outs which once were frowned upon and accomplished indirectly have now been legitimated and can be accomplished directly. See § 5:4.

8  Brudney and Chirelstein, Fair Shares in Corporate Mergers and Takeovers, 88 Harv. L. Rev. 297, 307 (1974).

9  Fischel, The Appraisal Remedy in Corporate Law, 1983 A.B.F. Res. J. 875.

10  See § 5496.

11  Eisenberg, Cases and Materials on Corporations (9th ed.) at 1019.

12        See §§ 5:1 to 5:6, 5:14, 5:20 and 5:23.

13        Highfields Capital, Ltd. v. AXA Financial, Inc., 939 A.2d 34 (Del. Ch. 2007), judgment entered, 2007 WL 3326123 (Del. Ch. 2007).

14        Del. Code Ann. tit. 8, 262(b).

15        Del. Code Ann. tit. 8, 262(b)(1).

16        Model Bus. Corp. Act § 11.01. but even this right is presented as an exception to a market out. Shareholders in a privately held corporation would have to rely on the general provisions providing appraisal rights

17        In contrast. Michigan appraisal rights when shareholders receive cash for their shares, an exception that will leave shareholders vulnerable to a majority shareholder cashing- then out Mich. Comp. Laws § 450.1762(2)(b). See Krieger v. Gast, 122 F. Supp. 2d 836 (W.D. Mich. 2000).

18        Mich. Comp. Laws § 450.1762(2)(b).

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.