Richard L. Jenson, ISB No. 11212
Cole S. Cannon (pro hac) UT Bar. No. 12053
CANNON LAW GROUP, PLLC
124 S 600 E
Salt Lake City, UT 84102
801-363-2999
lane@cannonlawgroup.com

*Attorney for Defendants Copeland, Southam, Symington, JIFU, Mango-JIFU, Pincast, KJC Global, and DBGK Holdings*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **TTAN, LLC**, a Utah limited liability company, and **BRADLEY J. BOYLE**, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> **KYLE J. COPELAND**, an individual; **PAUL SOUTHAM**, an individual; **DANIEN FEIER**, an individual; **SCOTT SYMINGTON**, an individual; **JIFU, LLC**, an Idaho limited liability company; **MANGO-JIFU, LLC**, a Utah limited liability company; **PINCAST LLC**, a Utah limited liability company; **KJC GLOBAL SOLUTIONS LLC**, a Delaware limited liability company; **DBGK HOLDINGS, LLC**, a Tennessee limited liability company; **SEVEN HOLDING LIMITED**, a UAE foreign entity; and **UNITY GLOBAL DMCC**, a UAE foreign entity, <br><br> Defendants. | Case No. 1:25-cv-00526-AKB <br><br> **SELLER DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO ADD AN EXHIBIT TO SUPPLEMENT SECTION III (B)(1)(h)(I) OF SELLER DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** |

Defendants Kyle J. Copeland ("*Copeland*"), Paul Southam ("*Southam*"), Scott Symington ("*Symington*"), JIFU, LLC ("*JIFU*"), Mango-JIFU, LLC, ("*MJ*"), Pincast, LLC ("*Pincast*"), KJC Global Solutions, LLC ("*KJCGS*"), and DBGK Holdings, LLC ("*DBGKH*") (collectively, "*Seller Defendants*") hereby submit this Reply in Support of Motion for Leave to Add an Exhibit to Supplement Section III (B)(1)(h)(I) of Seller Defendants' Response to Plaintiffs' Motion for

1

Temporary Restraining Order (the "*Reply*"). On February 27, 2026, Seller Defendants filed their Motion for Leave to Add an Exhibit to Supplement Section III (B)(1)(h)(I) of Seller Defendants' Response to Plaintiffs' Motion for Temporary Restraining Order (the "*Motion*"). On March 20, 2026, Plaintiffs TTAN, LLC ("*TTAN*") and Bradley J. Boyle ("*Boyle*") (collectively, "*Plaintiffs*") filed their Response to Defendants' Motion for Leave to Add an Exhibit to Supplement Section III B(1)(h)(I) of Seller Defendants' Response to Plaintiffs' Motion for Temporary Restraining Order [DKT. 54] (the "*Opposition*").

## ARGUMENT

### A. Plaintiffs Have Failed to Argue That the Filing of a Sur-Reply Lacks Good Cause, Raises New Arguments, Or Would Cause Prejudice to Plaintiffs.

"In determining whether to allow a sur-reply, a 'district court should consider whether the movant's reply in fact raises arguments or issues for the first time, whether the nonmovant's proposed sur-reply would be helpful to the resolution of the pending motion, and whether the movant would be unduly prejudiced were leave to be granted." *Cook v. Ryan*, 2018 U.S. Dist. LEXIS 3104, at 5 – 6 (D. Ariz., Mar. 5, 2018). Federal courts will grant leave to file sur-replies "in the absence of good cause where the non-moving party 'will suffer no prejudice by the filing of the sur-reply.'" *NCMIC Ins. Co. v. Smith*, 375 F. Supp. 3d 831, 836 (S.D. Ohio, Mar. 21, 2019) (citing *National City Bank v. Aronson*, 474 F. Supp. 2d 925, 930 (S.D. Ohio 2007); *see also J.R. Simplot Co. v. McCain Foods USA, Inc.*, 2021 U.S. Dist. LEXI 203528, n. 4 (D. Idaho, Oct. 20, 2021) ("If [a] sur-reply contains nothing new, there is no harm in allowing it….")

Plaintiffs fail to argue that the filing of a sur-reply lacks good cause, raises new arguments, or causes Plaintiffs to suffer prejudice. Thus, Plaintiffs concede these points. The Expert Valuation Report completed by Rocky Mountain Advisory ("RMA") merely provides evidential support to Seller Defendants' existing arguments in their Response to the Motion for Temporary Restraining

2

Order (the "*Response to TRO*"), and as evidenced by the Opposition, Plaintiffs address the Expert Valuation Report in full. Thus, there is no prejudice or unfairness in allowing Seller Defendants to supplement Seller Defendants' response to the Motion for Temporary Restraining Order with the Expert Valuation Report. *Id*.

**B.  The Expert Valuation Report is Central to the Pending TRO Motion.**

Plaintiffs argue that the valuation of JIFU is inconsequential in the TRO determination. Specifically, Plaintiffs state that "Defendants' implicit argument – that a lower valuation somehow reduces the need for asset preservation – is backwards. If anything, a lower valuation makes preservation more critical, because a smaller asset pool is more easily depleted." Opposition, at 2. However, this position neglects to take into account that Plaintiffs must show a likelihood of success on the merits, which means Plaintiffs must tie their request for injunctive relief to a claim they are likely to prevail on. Plaintiffs have brought their TRO motion in connection with their claims for securities exchange act violations, member oppression, breach of fiduciary claims, and civil conspiracy, and each of these claims are based on the premise that Seller Defendants have engaged in a "self-dealing" transaction that has under-valued JIFU and in turn, harmed Plaintiffs. *See* Plaintiffs' Verified Complaint, ¶¶ 3 – 4, 78, 81 – 87, 98 – 103, 106, 109, 115 – 116, 118 – 136. Plaintiffs' TRO Motion repeatedly complains about the $21,000,000 valuation, using this price as a basis to argue that the "$21,000,000 sale…was a sham[,]" and that JIFU has "an agreed value of $33 million[.]" TRO Motion, at 2 – 3. Hence, Plaintiffs have made the valuation of JIFU a key aspect of this litigation and their request for injunctive relief.

Plaintiffs cannot verify under oath that "[t]his scheme [is]…a calculated progression of oppressive and unlawful conduct designed to devalue TTAN's security and coerce its sale on Defendants" [sic] self dealing terms[,]" and then subsequently represent to the Court that a

TRO/preliminary injunction does not require "any particular valuation of TTAN." *See* Plaintiffs' Verified Complaint, ¶99; *see also* Opposition, at 2. If Plaintiffs are arguing that either (1) JIFU's assets have been sold for notably less than they are worth, or (2) Seller Defendants' actions have decreased the value of TTAN and/or JIFU, then the Expert Valuation Report has direct relevance. If Plaintiffs are not making such arguments, then Seller Defendants genuinely question what claim provides a basis for Plaintiffs to request the freezing of assets. Even if true, an information blockade, governance exclusion, Plaintiffs facing financial pressures, an "unfavorable" APA, and fabricated meeting minutes do not provide a justifiable basis to freeze all of JIFU's assets, as there is no causal link between the "harm" and the relief requested. Freezing JIFU's assets does not give Plaintiffs access to information. Freezing JIFU's assets does not provide Plaintiffs with governance rights and opportunities. Freezing JIFU's assets does not take away Plaintiffs' financial pressures. Freezing JIFU's assets does not unwind the objectionable APA terms, and freezing JIFU's assets certainly does not correct "fabricated" meeting minutes.

### C. Plaintiffs Continue to Make Baseless and Contradictory Arguments.

To save both the Court's time and Seller Defendants' time, Seller Defendants will not substantively respond to these outlandish arguments. Seller Defendants will merely point out that: (1) hiring an expert to provide an opinion central to Seller Defendants' defense is simply routine litigation conduct, (2) Seller Defendants have illustrated to the Court and Plaintiffs that the assets are secure (*see* Seller Defendants' Response to TRO), and (3) Plaintiffs claim that the Expert Valuation Report is irrelevant in Section A of the Opposition but then backtrack and state the Expert Valuation Report shows that "the dispute is fundamentally about how much th[e] value [of JIFU and TTAN] has been impaired by [Defendants] conduct" (*see* Opposition, at 2 – 3). If the Expert Valuation Report supports Plaintiffs' request for TRO/preliminary injunction (as alleged),

then they should have no objection for the Court to grant leave.

**D.  The Expert Valuation Report Supports the Denial of the TRO.**

Despite Plaintiffs' arguments, the confirmation of a "multi-million dollar interest" does not prove that "Defendants are actively working to extinguish" such an interest, and as argued in the Response to TRO, Defendants have not offered any credible evidence establishing that Seller Defendants are actively attempting to rob Plaintiffs of their interest. In fact, Defendants' AUP Report, completed by Richey, May & Co., LLC ("Richey May"), indicates there has been no dissipation of assets, and Defendants have even offered to place Plaintiffs' distributions with the Court multiple times. Regardless, the majority of Plaintiffs' arguments in Section C of the Opposition are dedicated to providing a DIY valuation. Plaintiffs are frankly not qualified to interpret this data given the fact that they rely on hindsight data, adjusted earnings, and selective multiples while ignoring risk factors, company-specific dependencies, and market realities.

**E.  Plaintiffs' Analysis is Flawed.**

Although Plaintiffs complain about the period evaluated in the Expert Valuation Report, the entire purpose of the Expert Valuation Report was to determine the value of JIFU at the time of sale (August 19, 2025). Thus, the expert examining the Q4 2025 period is inconsequential to this determination, as the Q4 2025 period could not have influenced the value of JIFU in August 2025. (Declaration of Kyle Copeland ("KC Decl.") filed concurrently herewith at ¶ 3.)

Moreover, Plaintiffs' claim that three versions of December 2025 financials render the data "inherently unreliable" is incorrect and reflects a misunderstanding of basic financial reporting. The minor variations in retained earnings cited by Plaintiffs are the result of routine year-end close adjustments, including accruals, intercompany reconciliations, foreign entity true-ups, and classification updates. Such adjustments are standard in any multi-entity business and occur as part

of the normal process of finalizing financial statements for tax compliance. Plaintiffs rely on interim, non-final financial data while ignoring that the year-end close process is ongoing and subject to refinement in coordination with accounting and tax professionals. These ordinary adjustments do not demonstrate inconsistency – they confirm that JIFU is properly completing its financial close. (KC Decl., at ¶ 4.)

Similarly, Plaintiffs' complaints concerning income statements and cash flow statements merely illustrate Plaintiffs' misunderstanding and confusion. The December cash flow statement shows the change from the prior month, not the change for the entire year. This is a basic accounting principle; thus, this analysis alone should discount Plaintiffs' credibility on these issues. (KC Decl., at ¶ 5.)

Plaintiffs' "phantom equity" argument fails because it ignores the structure of the transaction and misinterprets how the financial statements are presented across different entities and time periods. The underlying transaction involved the sale of assets to Unity Global DMCC under an installment structure, with Seller Defendants continuing to manage certain aspects of the books and operations of both entities during the payment period to ensure the full $21 million obligation is satisfied. As a result, the financial reporting reflects a transitional structure in which different entities are reported differently across periods. Unity Global DMCC and JIFU LLC maintain separate books and records, and each report independently for tax purposes. The 2025 financials include both entities, reflecting the total operational results for the year and not presenting a unified or permanent reporting structure. By contrast, the January 2026 financials reflect only Unity Global DMCC following the transaction. (KC Decl., at ¶ 6.) Plaintiffs ignore this basic distinction and instead treat consolidated operational reporting as if it were identical to entity-level financial and tax reporting. It is not, and Plaintiffs' failure to recognize this difference

6

is a notable source of the errors in their analysis. The differences Plaintiffs identify arise from changes in reporting structure, timing of the installment sale, and standard accounting adjustments applied during the transition – not from any "phantom equity" or fabrication. In addition, Plaintiffs ignore standard book-to-tax differences that arise in transactions of this nature, particularly where intangible assets and installment sale treatment are involved. Plaintiffs' arguments conflate different entities, different reporting frameworks, and different time periods, and then labels their misunderstanding and lack of financial accounting knowledge as Seller Defendants' misconduct. (KC Decl., at ¶ 7.)

Plaintiffs' characterization of a $32.4 million "accounting plug" is incorrect and based on a misreading of transaction-related accounting entries. Most notably, Plaintiffs, themselves, admit that this amount was properly eliminated through an adjustment in the financial statements. An entry that is identified and eliminated as part of the reporting process is, by definition, not "phantom," not hidden, and not fabricated. Plaintiffs isolate a single interim line item, ignore the corresponding adjustments they acknowledge exist, and then relabel the result as misconduct. This is not credible analysis. (KC Decl., at ¶ 8.).

Plaintiffs' arguments make unsupported accusations about expenses and mischaracterize the Expert Valuation Report. Expenses have not been "inflated to suppress profitability," and the Expert Valuation Report does not conclude that expenses were improperly "misclassified." Rather, it notes that certain items, such as repayments of board member investments, were recorded as expenses and then normalized for valuation purposes, which is standard practice in business valuation. Normalization adjustments are routinely applied to reflect ongoing operating performance and do not imply error, misconduct, or improper accounting. Plaintiffs' attempt to recast a standard valuation adjustment as evidence of wrongdoing is incorrect. (KC Decl., at ¶ 9.)

The expense categories Plaintiffs identify are legitimate and directly tied to JIFU's growth. Educator compensation reflects the economic reality of the business. These individuals are key drivers of revenue and are responsible for a substantial portion of JIFU's performance. Educators are not paid fixed salaries; they are compensated based on a percentage of the education revenue they generate. This performance-based structure directly aligns compensation with results and incentivizes increased sales. Educator compensation is therefore market-driven and tied to performance. Plaintiffs' assertion that "educator fees" are a new or suspect expense is incorrect. These costs were previously included within JIFU's consulting fee line items and were reclassified for reporting clarity. The underlying expenses did not change, only their presentation did, and Plaintiffs' failure to recognize this basic reclassification undermines their analysis. Furthermore, increases in employee-related expenses and operational costs reflect JIFU's expansion. These are not anomalous expenses; they are necessary investments to support scaling operations and increased sales. Although Plaintiffs claim that JIFU is highly profitable and significantly more valuable than reflected in the valuation, Plaintiffs simultaneously criticize the very expenditures that enabled that growth. (KC Decl., at ¶ 10.)

Plaintiffs' attack on the Expert Valuation Report and AUP Report rests on a fundamental mischaracterization of both engagements and the standard procedures that accompany them. The Expert Valuation Report expressly states that it performed a valuation engagement in accordance with American Institute of Certified Public Accountants ("AICPA"), Statement on Standards for Valuation Services ("SSVS"), and Uniform Standards of Professional Appraisal Practice ("USPAP,") used an August 19, 2025, effective date, and considered information "known or knowable" as of that date. Financial statements up through the time of the valuation were also provided to RMA, and no request of data was withheld. The Expert Valuation Report also certified

that the engagement was impartial and unbiased. Richey May likewise states that it performed an agreed-upon procedures engagement under AICPA attestation standards and that it was required to be independent of both counsel and JIFU. RMA's statement that it did not audit, review, or compile the financial information is standard for a valuation engagement, not a concession that the work lacks reliability. Richey May's statement that it did not conduct an audit or review is equally standard for an agreed-upon procedures engagement. Those statements define the scope of the work; they do not invalidate it. Both RMA and Richey May are independent accounting firms, and Seller Defendants did not influence or direct their conclusions.  All financial information requested by RMA and Richey May was provided, and at no time did Seller Defendants direct or cause any financial data to be withheld from them. (KC Decl., at ¶ 11.)  More importantly, Plaintiffs offer no competing expert analysis. Instead, they ask the Court to disregard the work of two independent, nationally recognized accounting firms (one performing under AICPA attestation standards, the other under AICPA valuation standards and USPAP) and replace that professional work with Plaintiffs' own unsupported interpretation of spreadsheets and accounting entries.

### F.  The Expert Valuation Report Discounts Are Legally Permissible.

Plaintiffs argue that the discounts applied in the Expert Valuation Report are "legally impermissible in the context of this case." Opposition, at 15. Plaintiffs cite Idaho Code Section 30-29-1301(4)(c) as a statutory prohibition to such discounts; however, upon review, it appears that this Idaho Code section only applies to corporations, not limited liability companies. Idaho Code Section 30-29-1301(3) states that "'Corporation' *means the domestic corporation* that is the issuer of the shares held by the shareholder demanding appraisal and…includes the survivor of a merger." Thus, JIFU, a limited liability company, cannot fall within the purview of Idaho Code Section 30-29-1301(4)(c). JIFU falls under the purview of the Idaho Limited Liability Company Act, not the

9

Idaho Business Corporation Act. Moreover, *Wagner v. Wagner* provides no support for the premise that discounts are legally impermissible. 160 Idaho 294, 301, 371 P.3d 807, 815 (2016). In fact, the court in Wagner ultimately held that "minority and lack of marketability discounts are just another fact that a court may consider in determining fair value…." *Id*. at 301 – 302.

Plaintiffs' second argument concerns non-waivable duties, and here, Plaintiffs cite Idaho Code Section 30-25-105(c)(6), which prohibits an operating agreement from eliminating the contractual obligation of good faith and fair dealing. Seller Defendants are merely attempting to supplement the Expert Valuation Report to its Response to TRO. Neither the Expert Valuation Report nor Seller Defendants are attempting to eliminate the contractual obligation of good faith and fair dealing. Plaintiffs claim that Seller Defendants "attempt[ed] to justify the discounts by reference to a 'withdrawal' provision in the Operating Agreement" (Plaintiffs' Response, p. 15). Yet, Plaintiffs did not provide a cite, and therefore, Seller Defendants do not know what Plaintiffs are referring to, rendering Seller Defendants unable to adequately respond. Finally, even if courts in the Eighth Circuit or Washington "routinely reject minority and marketability discounts in oppression cases," there are numerous examples of courts accepting minority and marketability discounts. Plaintiffs have not met their burden to show wrongdoing or oppression, and Idaho courts have held that minority and lack of marketability discounts may be considered by the court. *See Wagner*, 160 Idaho at 301 – 302.

## **CONCLUSION**

Wherefore, pursuant to the foregoing, Seller Defendants respectfully request that this Court grant their Motion.

Dated: April 3, 2026                         */s/ Richard L. Jenson*
                                             Richard L. Jenson, Esq.
                                             *Attorney for Seller Defendants*

10

**CERTIFICATE OF SERVICE**

HEREBY CERTIFY that on April 3, 2026, I filed the foregoing electronically

through the CM/ECF system, which caused all registered participants to be served by electronic

means, as more fully reflected on the Notice of Electronic Filing:

*/s/ Richard L. Jenson*
Richard L. Jenson