Richard L. Jenson, ISB No. 11212
Cole S. Cannon (pro hac) UT Bar. No. 12053
CANNON LAW GROUP, PLLC
124 S 600 E
Salt Lake City, UT 84102
801-363-2999
lane@cannonlawgroup.com

*Attorney for Defendants Copeland,*
*Southam, Symington, JIFU, Mango-JIFU,*
*Pincast, KJC Global, and DBGK Holdings*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **TTAN, LLC**, a Utah limited liability company, and **BRADLEY J. BOYLE**, an individual,<br><br>      Plaintiffs,<br><br>v.<br><br>**KYLE J. COPELAND**, an individual; **PAUL SOUTHAM**, an individual; **DANIEN FEIER**, an individual; **SCOTT SYMINGTON**, an individual; **JIFU, LLC**, an Idaho limited liability company; **MANGO-JIFU, LLC**, a Utah limited liability company; **PINCAST LLC**, a Utah limited liability company; **KJC GLOBAL SOLUTIONS LLC**, a Delaware limited liability company; **DBGK HOLDINGS, LLC**, a Tennessee limited liability company; **SEVEN HOLDING LIMITED**, a UAE foreign entity; and **UNITY GLOBAL DMCC**, a UAE foreign entity,<br><br>      Defendants. | Case No. 1:25-cv-00526-AKB<br><br>**DECLARATION OF KYLE COPELAND IN SUPPORT OF SELLER DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO ADD AN EXHIBIT TO SUPPLEMENT SECTION III (B)(1)(h)(I) OF SELLER DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** |

Based upon information and belief available to me at the time of this declaration, I, Kyle J. Copeland, declare as follows:

1.      I am an individual defendant in this matter and am currently the CEO of JIFU, LLC.

1

2.      I am familiar with JIFU's general business and operations, accounting procedures, and policies.

3.      The entire purpose of the Expert Valuation Report was to determine the value of JIFU at the time of sale (August 19, 2025). Thus, the expert examining the Q4 2025 period is inconsequential to this determination, as the Q4 2025 period could not have influenced the value of JIFU in August 2025.

4.      The minor variations in retained earnings cited by Plaintiffs in the three versions of December 2025 financials are the result of routine year-end close adjustments, including accruals, intercompany reconciliations, foreign entity true-ups, and classification updates. Such adjustments are standard in any multi-entity business and occur as part of the normal process of finalizing financial statements for tax compliance. These ordinary adjustments do not demonstrate inconsistency – they confirm that JIFU is properly completing its financial close.

5.      Similarly, Plaintiffs' complaints concerning income statements and cash flow statements merely illustrate Plaintiffs' misunderstanding and confusion. The December cash flow statement shows the change from the prior month, not the change for the entire year. This is a basic accounting principle.

6.      Plaintiffs' "phantom equity" argument ignores the structure of the transaction and misinterprets how the financial statements are presented across different entities and time periods. The underlying transaction involved the sale of assets to Unity Global DMCC under an installment structure, with Seller Defendants continuing to manage certain aspects of the books and operations of both entities during the payment period to ensure the full $21 million obligation was satisfied. As a result, the financial reporting reflects a transitional structure in which different entities are reported differently across periods.  Unity Global DMCC and JIFU LLC maintain separate books

and records, and each report independently for tax purposes. The 2025 financials include both entities, reflecting the total operational results for the year and not presenting a unified or permanent reporting structure. By contrast, the January 2026 financials reflect only Unity Global DMCC following the transaction.

7.      Plaintiffs ignore this basic distinction and instead treat consolidated operational reporting as if it were identical to entity-level financial and tax reporting. It is not. The differences Plaintiffs identify arise from changes in reporting structure, timing of the installment sale, and standard accounting adjustments applied during the transition – not from any "phantom equity" or fabrication. In addition, Plaintiffs ignore standard book-to-tax differences that arise in transactions of this nature, particularly where intangible assets and installment sale treatment are involved. Plaintiffs' arguments conflate different entities, different reporting frameworks, and different time periods, and then labels their misunderstanding and lack of financial accounting knowledge as Seller Defendants' misconduct.

8.      Plaintiffs' characterization of a $32.4 million "accounting plug" is incorrect and based on a misreading of transaction-related accounting entries. Most notably, Plaintiffs, themselves, admit that this amount was properly eliminated through an adjustment in the financial statements. An entry that is identified and eliminated as part of the reporting process is, by definition, not "phantom," not hidden, and not fabricated – it is being properly accounted for. Plaintiffs isolate a single interim line item, ignore the corresponding adjustments they acknowledge exist, and then relabel the result as misconduct. This is not credible analysis.

9.      Plaintiffs' arguments make unsupported accusations about expenses and mischaracterize the Expert Valuation Report. Expenses have not been "inflated to suppress profitability," and the Expert Valuation Report does not conclude that expenses were improperly

"misclassified." Rather, it notes that certain items, such as repayments of board member investments, were recorded as expenses and then normalized for valuation purposes, which is standard practice in business valuation. Normalization adjustments are routinely applied to reflect ongoing operating performance and do not imply error, misconduct, or improper accounting. Plaintiffs' attempt to recast a standard valuation adjustment as evidence of wrongdoing is incorrect.

10.     The expense categories Plaintiffs identify are legitimate and directly tied to JIFU's growth. Educator compensation reflects the economic reality of the business. These individuals are key drivers of revenue and are responsible for a substantial portion of JIFU's performance. Educators are not paid fixed salaries; they are compensated based on a percentage of the education revenue they generate. This performance-based structure directly aligns compensation with results and incentivizes increased sales. Educator compensation is therefore market-driven and tied to performance. Plaintiffs' assertion that "educator fees" are a new or suspect expense is incorrect. These costs were previously included within JIFU's consulting fee line items and were reclassified for reporting clarity. The underlying expenses did not change, only their presentation did, and Plaintiffs' failure to recognize this basic reclassification undermines their analysis. Furthermore, increases in employee-related expenses and operational costs reflect JIFU's expansion. These are not anomalous expenses; they are necessary investments to support scaling operations and increased sales. Although Plaintiffs claim that JIFU is highly profitable and significantly more valuable than reflected in the valuation, Plaintiffs simultaneously criticize the very expenditures that enabled that growth.

11.     The Expert Valuation Report expressly states that it performed a valuation engagement in accordance with AICPA SSVS and USPAP, used an August 19, 2025, effective

date, and considered information "known or knowable" as of that date. Financial statements up through the time of the valuation were also provided to RMA, and no request of data was withheld. The Expert Valuation Report also certified that the engagement was impartial and unbiased. Richey May likewise stated that it performed an agreed-upon procedures engagement under AICPA attestation standards and that it was required to be independent of both counsel and JIFU. RMA's statement that it did not audit, review, or compile the financial information is standard for a valuation engagement, not a concession that the work lacks reliability. Richey May's statement that it did not conduct an audit or review is equally standard for an agreed-upon procedures engagement. Those statements define the scope of the work; they do not invalidate it. Both RMA and Richey May are independent accounting firms and I did not influence or direct their conclusions. All financial information requested by RMA and Richey May was provided, and at no time did I direct or cause any financial data to be withheld from them.

I declare under penalty of perjury, under the laws of the State of Utah, that the foregoing is true and correct to the best of my knowledge.

Dated: April 3, 2026                               */s/ Kyle Copeland*_____
                                                            Kyle Copeland